BOYLE (Plaintiff) and others (Interveners), Respondents, vs. NORTHWESTERN NATIONAL BANK OF SUPERIOR, imp., Appellant.

*May 2—October 3, 1905.*

*Bailments: Sales on commission: Deposit of proceeds: Trust funds: Banks and banking: Offset.*

1. A corporation, of which S. was president, engaged in the commission business, became insolvent and ceased doing business. Thereafter S. engaged in the commission business, using as a designation the same name as that of the insolvent corporation. *Held*, that the commission business in which S. was last engaged was his personal business and not a continuation of the business of the corporation.

2. In such case S. deposited in the defendant bank, but in the name of the insolvent corporation, funds received from the proceeds of grain shipped him for sale on commission. *Held*, that the bank, without the knowledge or consent of S., could not offset and apply the funds so deposited upon an indebtedness due it from the insolvent corporation.

3. If money held by a person in a fiduciary character, though not as trustee, has been paid by him to his account at his banker's, the person for whom he held the money can follow it, and has a charge on the balance in the banker's hands.

4. A commission merchant on selling several consignments deposited the proceeds in defendant bank, and, at the date the bank unlawfully applied the merchant's deposit on the indebtedness of a third person, the amount on deposit was less than the aggregate due the consignors. *Held*, that the amount then standing to the commission merchant's credit was in equity the property of the owners of the net produce from which it was realized, and should be paid to them according to their proportionate shares thereof.

5. Where a fund on deposit in a bank was the proceeds of sales of grain that had been sold on commission by the depositor, and not his own personal moneys, the mere fact that, two months prior to the deposit therein of the proceeds of plaintiffs' grain, the bank had, with the depositor's consent, applied a part of such deposit on an indebtedness due it, did not give the plaintiffs a right of action to impose a trust in their favor upon the deposit then in the bank.

6. In such case the plaintiffs can only recover by showing that they are the equitable owners of the fund sought to be charged, and not by showing that some stranger had such right of action.

7. In such case the rights of the several plaintiffs in the deposit and the proper distribution thereof are ascertained and stated in the opinion.

8. Where a commission merchant deposits to his own credit in a bank the proceeds of sales for his principals, and depletes that deposit by his individual checks, the principal cannot recover the amounts so drawn out from the bank.

APPEAL from a judgment of the superior court of Douglas county: CHARLES SMITH, Judge. *Modified and affirmed.*

This action was brought by the plaintiff and the five interveners to recover from the defendant banks, or one of them, moneys realized as the proceeds of grain and flax sold for them, or some of them, on commission by E. Schwedler, between September 6, 1901, and February 10, 1902, and by him deposited in the *Northwestern National Bank of Superior,* and which bank sold and transferred all its assets to the *First National Bank of Superior,* which assumed all liabilities September 22, 1902. The facts are undisputed or found by the court, and are to the effect that the Schwedler Grain Company was incorporated and commenced doing the business of buying and selling grain and flax on commission in Superior in 1898, and continued doing such business until 1901; that during that time it did its banking business with the *Northwestern National Bank,* and became largely indebted to that bank, and at all times since 1900 such indebtedness was and now is $4,000, evidenced by the three notes in the record; that in the spring of 1901, on account of such

indebtedness and other things, the Schwedler Grain Company became embarrassed and passed into the hands of one F. R. Crumpton, trustee, who conducted the business for two or three months with the aid of Mr. Schwedler, who had been president of the corporation, but ceased to do such business in August, 1901, with such indebtedness still unpaid, and the same continued; that thereafter, and on or about September 1, 1901, Mr. Schwedler furnished the necessary capital and opened and continued such commission business on his own account but in the name of the Schwedler Grain Company, and in that name opened an account with the *Northwestern National Bank,* and all moneys received by him as proceeds of sales of grain and flax in such business, either individually or in the name of the Schwedler Grain Company, were deposited in that bank in that account, but that the Schwedler Grain Company had no interest in said business so carried on, on and after September 6, 1901; that the money deposited in that bank in the name of the Schwedler Grain Company was all of it received as the proceeds of the sale of grain and flax by Mr. Schwedler, and belonged to the customers or persons for whom he sold the grain and flax, except one half of one per cent. by way of commission earned by him, which was deposited with such other proceeds; that between September 6, 1901, and February 10, 1902, Mr. Schwedler received from various and divers persons shipments of grain and flax and sold the same on commission, and deposited the proceeds of the sales from day to day in that bank in that account—in many cases the freight being paid by the purchasers, and in other cases the gross proceeds of the sales were so deposited, and then the freight bills, the inspection, and other charges not paid by the purchasers were promptly paid by Mr. Schwedler's checks upon such account in that bank; that the credit in such bank account did not at any time after September 6, 1901, exceed the amount actually due to such customers as the proceeds of such sales; that Mr. Schwedler

from time to time drew out from such account, for his own use, his commissions and all moneys due him personally, and at no time was there in said account more than from $100 to $200 belonging to him, and that none of the money received in said account at the time of the trial belonged to or is claimed by Mr. Schwedler personally, or to any one else other than the parties to this action; that October 8, 1901, Mr. Schwedler, upon the demand and urgent request of that bank, through its president, drew and delivered to such president his check for $500, to be applied on the old indebtedness of the old company to said bank, at the same time notifying said president that the moneys so on deposit in said bank account did not belong to Mr. Schwedler nor to the old company, but did belong to such consignors of Mr. Schwedler; that the bank accepted the check with full knowledge of the facts stated and charged it to said account under date of October 9, 1901, and issued a cashier's check in favor of itself, but did not indorse or in any way apply any money or said check upon such indebtedness, but, on the contrary, credited the amount of the said check to its cashier's account, which was only, in effect, a method of bookkeeping; that December 1, 1901, the plaintiff *Boyle* shipped a carload of flax to Mr. Schwedler, which he sold on commission, and the proceeds were deposited by him in the account in that bank— $500 December 14, 1901, and $661.43 December 18, 1901— and that said moneys belonged to the said *Boyle;* that the intervener *Anderson* shipped a carload of grain to Mr. Schwedler, which he sold on commission, and the proceeds of such sale were deposited in such bank to the credit of said account January 24, 1902, and that the net amount of such proceeds, after deducting commission, freight, inspection, and other charges, was $430.38, and the same belonged to said *Anderson;* that the intervener *McNeil* shipped a carload of grain to Mr. Schwedler, which he sold on commission, and the proceeds of such sale, after taking out moneys advanced

and commissions to the amount of $147.35, belonged to *Mc-Neil,* and the same was deposited to the credit of said account in said bank January 30, 1902; that the intervener *Brown* shipped a carload of grain to Mr. Schwedler, which he sold on commission, and, after deducting advancements made thereon, the net proceeds thereof belonging to *Brown,* to the amount of $165.20, were deposited to the credit of said account January 31, 1902; that the intervener *Wibe* shipped a carload of grain to Mr. Schwedler, which he sold on commission, and in January, 1902, the proceeds thereof, amounting to $520.11, were deposited in said bank to the credit of said account, and, after paying commissions, freight, inspection, and other charges, the balance of $426.92 belonged to *Wibe;* that the intervener *Larson* shipped a carload of grain to Mr. Schwedler, which he sold on commission, and the proceeds thereof, amounting to $527.78, were deposited in said bank February 4 and 8, 1902, to the credit of said account, and, after paying commissions, freight, inspection, and other charges, the balance of $439.08 belonged to said *Larson;* that neither the plaintiff nor any of the interveners were informed of or knew or consented to the deposit of such proceeds of sales, or any part thereof, in said account or said bank, and each of them was entitled to have the net proceeds of his carload at once transmitted to him in the regular course of business; that the officers of that bank, and particularly the president, had notice and knowledge that the moneys so deposited were the proceeds of sales of grain shipped to and sold by Mr. Schwedler on commission and belonged to such shippers, although the names were not disclosed to the bank; that Mr. Schwedler had no authority to make any of such deposits; that the plaintiff and the said five interveners were all the trust creditors of Mr. Schwedler and all the unpaid persons whose moneys were deposited in said account; that the moneys so deposited in said account were mixed with the other moneys of the bank, and checks of Mr. Schwedler drawn thereon as

usual, and none were special deposits during any of the time from September 6, 1901, to February 10, 1902; that after the deposits of the proceeds of *Larson's* grain as mentioned, the only checks drawn upon or paid from said account were three, to wit: one for $4.20, one for $30, and the other for $75, making in all $109.20; that February 10, 1902, that bank, without the knowledge or consent of Mr. Schwedler, or the plaintiff, or any of said interveners, charged said account with $648 and credited the same to its cashier's account, claiming the right to apply it, as it had the $500, on the old indebtedness of the grain company, but did not in fact apply or indorse the same thereon; that such moneys of the plaintiff and each and all of the several interveners so deposited were placed in the general funds of the bank, and there kept, except as so drawn out on the checks of Mr. Schwedler, until September 22, 1902, and during that time such general fund never ran below $2,000; that on the day and year last mentioned such general fund and all the assets of that bank, including not less than $40,000 in cash, were turned over and transferred to the *First National Bank of Superior,* pursuant to a contract of purchase thereof, and the last-named bank then assumed and agreed to pay to each and all of the depositors the money due them out of the funds and assets so received, and the same were sufficient to meet all liabilities so assumed, including the amount standing to the credit of said account and the amount represented or charged by reason of such cashier's checks; that the funds of said banks, respectively, during the times named were increased and enriched to the extent of such deposits, less the amounts so drawn out on checks of Mr. Schwedler, and that each of said banks has been at all times entirely solvent; that from September 6, 1901, to September 22, 1902, the account so kept in the *Northwestern National Bank* showed the following balances: On February 16, 1902, and from that time to September 22, 1902, to the credit thereof, thirteen cents; that whether such

balance should be increased by adding thereto the $648 so charged to the account February 10, 1902, and the $500 so charged to the account October 9, 1901, or either of them, depended upon the determination of the court to be made therein; that, if the charge of $500 should be allowed to stand, the lowest balance between December 9, 1901, and February 10, 1902, was $153.50, January 2, 1902, and, if the $500 should be canceled, then the lowest balance would be. $653.50, January 2, 1902.

As conclusions of law the court found, in effect, that the issuing of the cashier's check of $500 and the crediting the same to the cashier's account October 9, 1901, was improper and ineffectual and did not in any wise affect the fund in the bank to the credit of said account; that the charge of $648 against said account and the crediting the same to the cashier's account and issuing a cashier's unsigned check therefor, February 10, 1902, was improper, illegal, and in no way affected the funds to the credit of said account; that the *Northwestern National Bank* had no right to appropriate the money so deposited in said account to apply upon its old claim against the grain company, and had no right to offset the same; that Mr. Schwedler's checks upon said account, so far as drawn in favor of his respective customers, must be presumed to have been drawn against funds of such customer, so far as he had any to meet the same; that checks drawn by him for his own use must be presumed to have been drawn out of his own funds, so far as he had any in the bank, and when he had none, or when the customers in whose favor a check was drawn had none, or, an insufficient amount, then the moneys paid out thereon, so far as there was a deficiency, should be deducted *pro rata* from the moneys of all other customers in said fund; that after annulling the two charges, $500 and $648, as mentioned, there was in the *Northwestern National Bank* to the credit of the account kept as aforesaid until September 22, 1902, $1,148.13, which funds were at that time

transferred by that bank to the *First National Bank*, and are now held by it; that the plaintiff and the intervening creditors were entitled to recover said moneys in the following amounts: *Boyle* $258.72, *Wibe* $169.01, *Anderson* $170.38, *McNeil* $58.35, *Brown* $65.40, *Larson* $426.27; that the *First National Bank* pay into court the $1,148.13 and take the clerk's receipt therefor; that the cashier's check of October 9, 1901, and the unsigned check of February 10, 1902, be canceled, and that such payment, being made, would be a full discharge; that out of the moneys so paid in the clerk shall pay over to the plaintiff and the intervening creditors, respectively, the sums mentioned in the above conclusion of law; that the plaintiff and interveners recover from the *Northwestern National Bank* costs and disbursements as therein mentioned; and that the plaintiff *Boyle* is entitled to recover as damages of the *Northwestern National Bank* interest upon his share of the sum mentioned from February 5, 1903, amounting to $21.99. The interveners do not claim interest, and so none is allowed to them. And the court thereupon ordered judgment to be entered according to such findings. From the judgment so entered the *Northwestern National Bank* appeals.

*Solon L. Perrin,* for the appellant.

*John Brennan,* for the respondent *Boyle.*

For the respondent interveners there was a brief by *Luse, Powell, deForest & Luse,* for *Larson, Wibe,* and *Anderson,* and by *E. C. Kennedy* for *McNeil* and *Brown,* and oral argument by *L. K. Luse.*

The following opinion was filed June 23, 1905:

CASSODAY, C. J. 1. Under the findings of the court and the evidence, the commission business in which Mr. Schwedler was engaged from September 6, 1901, to February 10, 1902, must be regarded as his personal business and not a continuation of the business of the old grain corporation of

which he had previously been the president, and which corporation was indebted to the bank during the time mentioned in the sum of $4,000. It appears from the findings and is undisputed, that the moneys received from time to time by Mr. Schwedler on the sale of grain and flax on commission during the period mentioned were deposited by him in the bank and that he drew checks thereon as stated. It also appears and is undisputed, that the last deposit so made by him was on February 8, 1902, the same being proceeds of the sale of *Larson's* grain; that, after making that deposit, Mr. Schwedler only gave three checks drawn on that account, amounting in the aggregate to $109.20; and that after deducting that amount from the amount standing to his credit on the books of the bank there remained a balance to his credit on the morning of February 10, 1902, of only $648.13, notwithstanding Mr. Schwedler had deposited in the bank to the credit of that account between December 1, 1901, and February 10, 1902, $2,770.38, being the proceeds of sales of grain and flax belonging to the plaintiff and the five interveners, respectively, and none of which had been paid to them or any of them. On February 10, 1902, the bank, without the knowledge or consent of Mr. Schwedler, or the plaintiff, or any of the interveners, and upon an unsigned check or memorandum drawn by itself, as found, charged said account with $648 and credited the same amount to its cashier's account; and by virtue of such charge and credit so made the bank claims the right to withhold said $648 from the plaintiff and the five interveners and any of them, and apply the same upon the debt which the grain corporation owed the bank. The trial court held that such claim was without foundation and that such charge and credit so made were improper, illegal, and in no way affected or diminished the amount of $648.13 so standing to the credit of Mr. Schwedler on the morning of February 10, 1902. One of the important questions in the case is whether such ruling of the trial court is

correct. It is to be observed that Mr. Schwedler makes no claim to any part of the money so on deposit. It is also found that the plaintiff and the five interveners are the only persons whose moneys were so deposited in said account and who have not been paid.

The question recurs whether, in equity, the money so on deposit should be paid to the owners of the produce from which it was realized or to the bank, to be applied on its old claim against the grain corporation. It is very evident that whenever Mr. Schwedler sold a carload of grain or flax on commission, and received pay for the same, such proceeds, after deducting commissions, freight, inspection, and other charges, were held by him for the owner of the grain or flax so sold. The contention seems to be that by depositing such proceeds in the bank to the credit of such account the same became mixed with the funds of the bank generally, and that by reason of such mixture it became impossible to trace and identify the particular money so deposited as entering into any specific fund or property so sought to be charged. In support of such contention counsel cite *Nonotuck Silk Co. v. Flanders,* 87 Wis. 237, 241, 242, 58 N. W. 383; *Burnham v. Barth,* 89 Wis. 362, 366–370, 62 N. W. 96; *Dowie v. Humphrey,* 91 Wis. 98, 102–104; *Bromley v. C., C., C. & St. L. R. Co.* 103 Wis. 562, 568, 569, 79 N. W. 741; *Hyland v. Roe,* 111 Wis. 361, 366, 367, 87 N. W. 252. These cases do not, in our judgment, go to the extent claimed. On the contrary, "the more recent rule in England," followed in these cases, is that:

"If money held by a person in a fiduciary character, though not as trustee, has been paid by him to his account at his banker's, the person for whom he held the money can follow it, and has a charge on the balance in the banker's hands." *In re Hallett's Estate,* L. R. 13 Ch. Div. 696.

The reasons for the rule are so fully stated by the learned Master of the Rolls in that case as to render it unnecessary

to add to such reasoning here. At least two of the cases cited by counsel for the defendant expressly sanction the rule thus quoted, and the others, in a general way, approve of the decision from which they are quoted. There is no purpose here of renewing a discussion which is so fully covered upon reason and authority by our own cases. Nevertheless we venture to quote from two decisions in the supreme court of the United States what seems to be peculiarly applicable to the case at bar:

"Although the relation between a bank and its depositor is that merely of debtor and creditor, the money which he deposits, if held by him in a fiduciary capacity, does not change its character by being placed to his credit in his bank account. The bank contracts that it will pay the money on his checks, and when they are drawn in proper form it is bound to presume, in case the account is kept with him as a trustee, or as acting in some other fiduciary character, that he is in the course of lawfully performing his duty, and to honor them accordingly; but when against such an account it seeks to assert its lien for an obligation which it knows was incurred for his private benefit, it must be held as having notice that the fund is not his individual property, if it is shown to consist, in whole or in part, of money which he held in a trust relation." *National Bank v. Insurance Co.* 104 U. S. 54.

"A bank receiving on deposit from a factor, under the circumstances set forth in this case, moneys which it must have known were the proceeds of property of the factor's principal, consigned to him by the principal for sale on the principal's account, of which moneys the principal was the beneficial owner, cannot, as against the latter, appropriate the deposits to the payment of a general balance due to the bank from the factor; and if it attempts to do so the remedy of the principal against the bank is in equity and not at law." *Union Stock Yards Bank v. Gillespie,* 137 U. S. 411, 11 Sup. Ct. 118.

Upon the strength of these authorities and many others which might be cited, it is manifest that the $648.13 standing to the credit of Mr. Schwedler on the books of the bank on

the morning of February 10, 1902, was in equity the property of the owners of the net produce from which the same was realized, and should be paid to such owners according to their proportionate shares thereof in equity.

2. The right to the $500 mentioned is governed by a different principle. The trial court held, in effect, that the check given by Mr. Schwedler on said account to the president of the bank October 8, 1901, for $500, and charging of the same to said account, and issuing the cashier's check therefor, and crediting the amount of the check to the cashier's account, was only, in effect, a method of bookkeeping and was improper and ineffectual, and did not in any wise affect the fund in the bank to the credit of said account. Assuming such findings and ruling to be correct, the question recurs whether the trial court properly held that the $500 thereafter remained to the credit of Mr. Schwedler's account, and was in equity the property of the plaintiff and the interveners and subject to be charged as such in this action. The nature of the action seems to have been lost sight of. This is not a proceeding by attachment or garnishment. The question is not whether the bank wrongfully induced Mr. Schwedler to give the check on the fund in the bank, which in equity belonged to his consignors, but whether such fund belonged to the plaintiff and the interveners, or some of them, at the time the check was so given. As stated in some of the adjudications cited, the right of action to trace the moneys and charge the fund has its basis in the right of property, but never upon the theory of preference by reason of an unlawful conversion. *Nonotuck Silk Co. v. Flanders,* 87 Wis. 237, 242, 58 N. W. 383. So, as stated by Mr. Justice PINNEY in one of the cases cited and reiterated in others:

"When the trust fund cannot be identified or traced into some specific estate or substituted property, and the means of ascertainment fail, the trust wholly fails, and the party can only prove as a general creditor. . . . As the right to

trace his trust fund is founded on the right of property and not on the ground of compensation for its loss, he must be able to point out the particular property into which the fund has been converted. When he is unable to do this, the trust fails and his claim becomes one for compensation only, for the loss of the fund, and stands on the same basis as the claims of general creditors. . . . Where the trust fund cannot be traced, and the substituted property into which it has entered specifically identified, the trust fund must be regarded as dissipated, within the meaning of the authorities—scattered, dispersed, and, as such, destroyed." *Burnham v. Barth,* 89 Wis. 362, 367, 369, 370, 62 N. W. 96; *Dowie v. Humphrey,* 91 Wis. 98, 103, 64 N. W. 315.

Mr. Schwedler's check for $500 was given to the bank nearly two months prior to the time when the plaintiff or any of the interveners shipped any grain to Mr. Schwedler, and more than two months prior to the time when any money belonging to the plaintiff or any of the interveners was so deposited in the bank. This being so, it is very obvious that such check was not drawn upon any fund in which the plaintiff or any of the interveners had any interest. If, as found by the court, Mr. Schwedler, at the time of giving that check, notified the president of the bank that the money then in the bank to his credit in said account did not belong to him nor to the grain corporation, but did belong to those who had previously made consignments to him, still that could give no right of action in favor of the plaintiff or any of the interveners, in equity, to charge the fund then in the bank. In other words, the plaintiff and the interveners can only recover in this form of action by showing that they, or some of them, are the equitable owners of the fund sought to be charged, and not by showing that some stranger to the action had such right of action. We must hold that the trial court improperly held the bank liable for the fund of $500 covered by Mr. Schwedler's check of October 8, 1901.

*By the Court.*—The judgment of the superior court for Douglas county is hereby modified by reducing the amount

of the recovery from the *First National Bank* to $648.13, and that the same be divided between the parties equitably entitled, as indicated in this opinion, and that, as so modified, the judgment is affirmed, with costs in favor of the appellant.

The plaintiff and the interveners moved for a rehearing, which was denied without costs, and the following opinion was filed October 3, 1905:

CASSODAY, C. J. The motion for a rehearing presents no ground for holding the bank liable in this action for the $500 for which Mr. Schwedler gave his check more than a month prior to the time when any money belonging to the plaintiff or to any of the interveners was deposited in the bank. The reason for this ruling is sufficiently stated in the opinion filed (*ante,* pp. 498, 505–511, 103 N. W. 1123, 1127, 1128). So, for the reasons there given (*ante,* pp. 505–510, 103 N. W. 1126, 1127), we adhere to the ruling there made "that the $648.13 standing to the credit of Mr. Schwedler on the books of the bank on the morning of February 10, 1902, was in equity the property of the owners of the net produce from which the same was realized, and should be paid to such owners according to their proportionate shares thereof in equity." We are now asked to fully determine the rights of the parties upon the facts here presented. While the principles upon which those rights are to be determined are stated in the former opinion, yet the rights of the respective parties are not there stated in detail.

The question is as to the proper distribution to be made of the $648.13 to the credit of Schwedler in the bank on the morning of February 10, 1902. As stated in that opinion, $1,161.43 belonging to the plaintiff, *Boyle,* was deposited in the bank to the credit of Schwedler December 14 and 18, 1901. Upon the theory that there was only $648.13 to be distributed, it was found by the trial court and is undisputed

that the lowest balance to the credit of Schwedler between December 9, 1901, and February 10, 1902, was $153.50, on January 2, 1902. Since no money belonging to any of the interveners went into the bank prior to the day and year last mentioned, it is manifest that the $153.50 so to the credit of Schwedler January 2, 1902, was in equity the property of *Boyle.* It is also manifest, upon the principles stated, that the moneys belonging to *Boyle* which had been drawn from the bank on the checks of Schwedler prior to January 2, 1902, cannot be reached by him in this action. It appears from the findings and is undisputed that after January 2, 1902, and during that month, there were deposited in the bank to the credit of Schwedler moneys belonging to the following interveners, respectively, in the amounts stated, to wit: *Wibe,* $426.92; *Anderson,* $430.38; *McNeil,* $147.35; and *Brown,* $165.20—making in the aggregate, with the amount so belonging to *Boyle,* $1,323.35. It also appears from the findings and is undisputed that the intervener *Larson* shipped to Schwedler a carload of grain, which he sold on commission, and the proceeds thereof, amounting to $527.78, were deposited in the bank to the credit of Schwedler February 4 and 8, 1902, and that after paying therefrom the freight, inspection, and other charges, including commissions, the balance thereof, amounting to $439.08, belonged to *Larson,* and that after such deposit of the proceeds of *Larson's* grain "the only checks drawn or paid upon said account were three in number, . . . amounting in the aggregate to $109.20." Assuming that this amount was all paid from the proceeds of *Larson's* grain, then, by deducting this amount from the $527.78, the proceeds of *Larson's* grain so deposited, there remains a balance of at least $418.58 as belonging to *Larson,* and which must have been in the bank to the credit of Schwedler on the morning of February 10, 1902. We perceive no reason why *Larson* is not entitled to that amount in the judgment to be entered in this action. Deducting the $418.58 from the $648.13

standing to the credit of Schwedler on the morning of February 10, 1902, and it leaves a balance of $229.55 to be distributed to *Boyle* and the four interveners whose moneys went into the bank to the credit of Schwedler in the month of January, 1902, as stated, according to their proportionate shares thereof in equity; that is to say, to *Boyle* $26.63, to *Wibe* $74.05, to *Anderson* $74.65, to *McNeil* $25.56, and to *Brown* $28.66, making a total of $229.55. This gives to each a little over seventeen and one third per cent. on the amount of his claim for his money so on deposit in January, 1902. The division thus to be made is in accordance with the principles stated in the former opinion.

*By the Court.*—The judgment of the superior court for Douglas county is hereby modified by reducing the amount of the recovery from the *First National Bank* to $648.13, and that the same be divided between the parties equitably entitled, as indicated in the former opinion and as stated in this opinion, and that, as so modified, the judgment is affirmed, with costs in this court in favor of the appellant.