EMIGH and another, Respondents, vs. EARLING, Receiver,
and another, imp., Appellants.

*January 31—February 18, 1908.*

*Banks and banking: National banks: Taking over business of insolv-
ent creamery corporation: Receipts of proceeds of butter manu-
factured: Liability of bank: Checks: Payment: Insolvent na-
tional banks: Creditors: Claims: Dividends: Trust funds: Iden-
tification: Tracing trust funds: Presumptions: Defenses: Ultra
vires.*

1. In an action against the receiver of an insolvent national bank
   the evidence, stated in the opinion, is *held* to warrant a finding
   that designated transactions between the bank's cashier and an
   insolvent creamery corporation constituted a turning over of
   the creamery corporation's property to the bank, for its corpo-
   rate purposes, with the bank's cashier serving merely as nom-
   inal custodian of title for it, and consequently that the bank,
   and not the cashier, collected the proceeds of the sales of but-
   ter manufactured while operating the creameries.
2. In such case, by virtue of the agreements under which the pa-
   trons of the creamery company delivered their milk, stated in
   the opinion, it is *held* that the proceeds of the butter manufac-
   tured, after deducting the fixed commission or toll allowed the
   creamery company by the patrons, remained their property and
   not merely a debt from the person collecting the same, and
   hence that the bank, having assumed the place formerly occu-
   pied by the creamery company, when it collected the proceeds
   held the same as the property of the patrons until it was in
   fact paid over to them.
3. In such case it is also *held* that when the bank applied such
   money to another purpose and failed on demand to pay it over,
   it at least became indebted therefor to the owners.
[4. Whether the bank might also have been guilty of an unlawful
   conversion, not considered, since no judgment was rendered
   based on such view.]
5. Where a bank took over the property of a creamery company,
   subject to contracts with the patrons for milk supplied, and is-
   sued its checks for the patrons' shares of the proceeds of butter
   manufactured, such checks are *held* not to constitute payment,
   but merely an evidence of the amount of money which the bank
   held belonging to each patron.

6. In such case, where the bank became insolvent and payment of such checks was refused, and it appeared that prior to that time the bank had used such patrons' money for other purposes, the bank is *held* to have become the debtor of such patrons as much as any of its other creditors, and such patrons had a right to stand as general creditors of the bank and share in any dividends that might be declared out of its assets.

7. Trust funds coming into the hands of a receiver of a national bank, which are not identified as ·belonging to any particular person, are held by the receiver as assets of the bank and must be ratably apportioned among all the bank's creditors.

8. When moneys belonging to other persons are received and mingled in a general fund with moneys belonging to a depositary or a trustee, and then such depositary or trustee pays out generally from such fund for its own purposes, there is a presumption that such payments are made from moneys in such fund belonging to such depositary or trustee and do not constitute wrongful *misappropriations* of the money ·of the *cestui que trust*, but that such moneys remain on deposit.

9. Such presumption is possible of complete effect only so long as the fund is large enough to contain all the moneys of the *cestui que trust* and some of the moneys of the trustee.

10. In an action against the receiver of an insolvent national bank it appeared, among other things, that the bank had received all the property of an insolvent creamery company and had continued the business of the creamery company with its patrons under agreements whereby the proceeds of the butter manufactured, after deducting the fixed commissions or toll allowed the creamery company, remained the property of such patrons; that during the two months prior to the bank's insolvency the proceeds of butter sold were received by the bank, either actually or through the bank's correspondents, to whom drafts therefor had been sent for collection; that at no time had the bank's money on hand or at credit with its correspondents been reduced below the amounts received for such butter, and that all of such funds of the bank and credits with the correspondent banks had passed to the receiver and had either been collected by him or still remained under his control. *Held*, that the receiver had in his possession, in actual money or credits, the funds belonging to such patrons and was chargeable with the duty of paying it to such patrons, the true owners.

11. In such case it is no answer to the receiver's obligation that the bank had no legal power to take the steps by which the patrons' money came into its hands, since, having taken such steps and obtained their money, no such absurdity exists as a legal ob· stacle to its surrendering it.

Emigh v. Earling, 134 Wis. 565.

[12. The exact limits of the power of a bank which, being a creditor,
becomes possessed of property or property rights as security,
to do acts in management or improvement of such property or
development of such rights in order to render them valuable,
to the end, in good faith, of thereby securing liquidation of the
debts to it, is quite indefinite, but public policy seems to require
that a bank, like an individual, should have broad powers of
the exercise of discretion and judgment, to the end that prop-
erty or rights so held as security be rendered as valuable as
possible so that it may not lose that which it ought to collect.]

APPEAL from a judgment of the circuit court for Green
Lake county: CHESTER A. FOWLER, Circuit Judge. *Affirmed.*

For several years prior to 1902 D. J. Jenne and E. H.
Jenne were engaged in the creamery business with head-
quarters at Berlin, Wisconsin, but running several branch
creameries and skimming stations in that vicinity. Since
about March, 1902, the business had been in form conducted
by a corporation known as the Jenne Creamery Company, of
which the stock was all controlled and the offices all held by
the Jennes. The business was conducted upon an arrange-
ment with the farmers who supplied the milk, known as "the
patrons," that the Jennes were to take the milk, manufacture
therefrom the butter, sell the same and divide the proceeds,
three and one-half cents to the Jennes for their services and
the balance of the sale price to the patrons. Their method
of making division was to deposit to their own account in
Berlin bank all sums which were usually received in bank
checks or drafts from the purchasers, and at the end of the
month to draw their individual checks to the several patrons
for the amount to which they were found to be entitled upon
a computation of the amount of cream or milk supplied by
each. In October, 1902, the Jennes were much embarrassed.
They owed the bank individually and as a firm the sum of
some $7,200. One of them owed about $2,600 individually
to others, and the Jenne Company had an unascertained
present overdraft at the bank and had outstanding an esti-
mated amount of $5,000 (subsequently ascertained to be

$8,000) of its checks to patrons not yet presented. D. J. Jenne had a mortgaged farm and some other property, and the Jenne Company in form owned the creamery and machinery and leases of several tributary stations estimated at that time to be worth $7,000 or $8,000. In this situation D. J. Jenne came to the bank and had a consultation with the cashier, Mr. Brown, in which he laid before him his condition, stated his belief that with the volume of milk contributed by the patrons the three and one-half cents a pound for butter which they were entitled to would gradually tend whereby all the property of the Jennes was conveyed to the business by creditors would result in bankruptcy, with probably much loss to the bank. He proposed to turn over all property in order that it might be realized to the best advantage towards the payment of debts. Several others of the bank officers were called in to the consultation, and at last it was agreed to adopt this general plan in order, as they said, to get as much salvage as possible for the bank. Accordingly the bank's attorney drew a written agreement, whereby all the property of the Jennes was conveyed to the cashier, Brown, in trust, to realize the same in his discretion by sale or use and apply the proceeds to all debts of D. J. and E. H. Jenne. The conveyance included the entire capital stock of the Jenne Creamery Company, and he was authorized, at his option, either to close up that company or continue its operation, or form a new corporation, and ultimately, after all debts were paid, to return any remainder of the property to the Jennes. Upon the transfer of such property, including the stock in the corporation, the latter was equipped with new officers, consisting of the president and vice-president of the bank and Brown, the cashier, who supervised the running of the business of the creamery company, except the manufacturing and selling, which was conducted by employees. The farm of D. J. Jenne was sold so as to yield $4,000 above its mortgage, and with this his per-

sonal debts, other than to the bank, were paid and a surplus of some $1,400 applied to his debt to the bank. The milk of the various patrons was received in the name of the Jenne Company, manufactured into butter, sold, and the gross proceeds deposited in the bank by Brown in an account in the name of the Jenne Creamery Company, and checks were drawn against that account both for the share to which the patrons were entitled and for the other expenses of the creamery business, and the outstanding checks of the company which had been given prior to the transfer of the stock were paid as presented and charged up against this account. The business does not seem to have resulted profitably, for from time to time, as the amounts paid out exceeded those received, a note would be made by Brown in the name of the Jenne Creamery Company and placed to the credit of said bank account. This course of business continued up to November, 1904, when the bank was closed by the comptroller of the currency and later placed in the hands of defendant *Earling* as receiver. At that time the account of the creamery company was exhausted or overdrawn; that is to say, all moneys that had been theretofore received from the sale of butter had been paid out to some one, mainly, of course, upon checks to the patrons. There were $406.97 of such checks issued prior to October 1, 1904, which had not been presented and paid. There had been no checks issued to patrons for the proceeds of butter made from the milk brought in by them during the month of October and that part of November prior to the suspension of the bank. It was shown and found by the court that bank drafts had been received into the bank for such butter. Such drafts ran to the Jenne Creamery Company and were indorsed by Brown, the cashier, and mingled with other moneys of the bank. The total amount was $2,520.46. It was found by the court, upon careful analysis of the accounts, that at all times after the receipt of any of said drafts the bank had on hand an

amount of money and cash items exceeding said total, and such an amount was turned over to the receiver upon his taking possession. It also traced a considerable share of said drafts into the hands of the bank's correspondents at other cities by which they had been collected and credited to the bank; and in each case it was found that there remained a credit account with that correspondent larger than the amount of such drafts sent to and collected by it, which credit balance was turned over to the receiver after his appointment. It appeared that upon the closing of the bank Brown desisted from all connection with this creamery business, and a small amount of drafts that afterwards came in for cream passed directly into the possession of the receiver. The court found as a fact that the arrangement whereby the Jennes turned over their property, including the control of the creamery business, was had by them with the bank as such, that the use of Brown's name was only formal, and that the continuance in form of the corporation was only for convenience of bookkeeping and dealing with the patrons, so that the bank received directly to its own use all of the proceeds of the butter sold; that by the terms of the agreement with the patrons the share of those proceeds apportionable to them was at all times their property, and that the Jenne Company while in operation, and the bank in continuing its business, was a mere trustee and received the proceeds of the butter for and as the property of the respective patrons, and hence that when it paid out that money to others than the owners of it, it at least remained indebted to such owners, and on that theory declared the holders of the $400 of checks for moneys collected prior to October were general creditors of the bank and entitled to the dividends like any other creditors. As to the moneys which had come into the bank for cream sold in October and November it was held that they had not been paid out but were in the bank at the time of its suspension, and were turned over to the receiver and were charged

with their trust character in his hands, and accordingly adjudged liability against him for the whole amount thereof to the plaintiffs, to whom all of the patrons had assigned their claims. From such judgment both defendants appeal.

For the appellants there was a brief by *Perry Niskern* and *Rufus S. Simmons,* attorneys, and *Simmons, Mitchell & Irving,* of counsel, and oral argument by *Mr. Simmons.*

For the respondents there was a brief by *E. F. Kileen,* attorney, and *Thompsons, Pinkerton & Jackson,* of counsel, and oral argument by *Mr. Kileen* and *Mr. J. C. Thompson.*

Dodge, J.   The first and probably the most earnestly contested question of fact was whether the transaction between the Jennes in October, 1902, constituted a turning over of the former's property to Brown as an individual or, instead, to the bank, for its corporate purposes, with Brown serving merely as nominal custodian of title for it; and as a result whether the bank collected the proceeds of the sales of butter or the same were collected by Brown as an independent individual and were received by the bank from him as his money and not the bank's. The trial court, after hearing all the evidence, seeing all the parties, and evidently considering all the circumstances and conduct, has reached the conclusion that the transaction was with the bank, and that what Brown did the bank did, and where Brown's name was used such use was nominal only; and has especially found that it was the bank through its officers and directors which took the milk furnished by the patrons, made the same into butter, and sold it and collected the proceeds. After a careful review of that evidence we cannot say that it preponderates against this finding in any such manner or degree as could warrant us in reversing the same, even in view of the vigorously urged improbability that a national bank would so far depart from its legitimate business as to engage in the manufacture and sale of butter. We therefore assume such find-

ing of fact as a starting point for considering the rights of the parties. The agreement under which the patrons delivered their milk is generally set forth in the statement of facts. We have no doubt that under the authority of *Boyle v. N. W. Nat. Bank,* 125 Wis. 498, 103 N. W. 1123, 104 N. W. 917, the proceeds of the butter, after deducting the fixed commission or toll allowed the Jenne Creamery Company by the patrons, remained their property and not merely a debt from the person collecting the same, and that the bank, having received the money under and by virtue of these contracts, assumed the place formerly occupied by the Jenne Company, and, when it collected the proceeds, held the same as the property of the owners, the several patrons, until it was in fact paid over to them.

It being established that this butter money belonged to the patrons and was received by the bank for them and under a duty to pay it to them, it follows that when the bank applied such money to another purpose and failed on demand to pay it over, it at least became indebted therefor to the owners. Whether it might also have been guilty of an unlawful conversion need not here be considered, as no judgment has been rendered based upon such view. Now, in the several months prior to October it had done just this thing with the moneys of certain of the patrons. True, it had issued its checks to those patrons, for under the findings of the court the checks drawn in the name of the Jenne Creamery Company by Brown against the moneys which the bank had received must be deemed in all legal effects the same as if drawn by the bank upon itself. But these checks constituted no payment, but merely an evidence of the amount of money which the bank held belonging to each of these patrons. When, upon the closing of the bank, payment of these amounts was refused, and it was made apparent that prior to that time the bank had used the money for other purposes, either to pay expenses of the creamery business or to apply upon the in-

dcbtedness to it of the creamery company, or otherwise, the inevitable result was that the bank was at least a debtor of the owners of the money as much as any other of its creditors. Hence we cannot doubt the correctness of the court's conclusion with reference to the $406.97 which was in this situation. The owners had a right to stand as general creditors of the bank and to share in any dividends that might be declared out of its assets, which had been enhanced by the receipt and appropriation to the bank's uses of their proper moneys.

The question with reference to the moneys which were shown to have been received by the bank during October and November, and which the receiver was required to pay to the owners in full, involves very different consideration. Of course the receiver could be under no duty to pay to them unless he received their moneys while capable of identification as such. What was not identifiable as belonging specifically to anybody else came to his hands as assets of the bank, and, under the national banking act, must be ratably apportioned amongst all its creditors. R. S. U. S. §§ 5236, 5242 [U. S. Comp. St. 1901, pp. 3508, 3517]; *Davis v. Elmira Sav. Bank,* 161 U. S. 275, 16 Sup. Ct. 502. It is a principle generally established and fully adopted in this state, as appears by *Bromley v. C., C., C. & St. L. R. Co.* 103 Wis. 562, 79 N. W. 741, and *Boyle v. N. W. Nat. Bank, supra,* that when moneys belonging to other persons are received and mingled in a general fund with moneys belonging to the depositary and then such depositary or trustee pays out generally from such fund for his own purposes, there is a presumption of law that such payments are made from the moneys in said fund belonging to him and do not constitute wrongful misappropriations of the moneys of the *cestui que trust,* which he has no right to pay out in that way, but that they remain on deposit. Of course this presumption is possible of complete effect only so long as the fund is large

enough to contain all the moneys of the *cestui que trust* and
some of the moneys of the trustee. But in this case the
court has carefully analyzed the condition of the bank's
funds through the entire months of October and November
and has found that at no time after any of the proceeds of
October butter came to the bank has its money on hand been
drawn down to a sum less than the amounts so received, from
which must result the presumption that the balance which it
at all times had on hand included the very moneys so col-
lected and belonging to these patrons, and that their moneys,
therefore identifiable, were in the possession of the bank at
the time of its closing and passed into the physical possession
of the receiver. Lest this presumption should be thought
to be overcome by proof that the proceeds of any individual
draft for butter did not go into the fund of money in the
bank's vaults or custody, but was otherwise specifically dis-
posed of, the court below also traced each specific draft and
in great detail ascertained that where they had been sent to
one or another of the bank's correspondents for collection
they had been collected and had been placed to the credit of
the bank in its account with said correspondents, where, of
course, they remained charged with the same trust as against
the defendant bank as if in its physical possession. *Boyle
v. N. W. Nat. Bank,* 125 Wis. 498, 103 N. W. 1123, 104
N. W. 917. The court then proceeded to ascertain in the
case of each of the bank's correspondents who had received
any one or several of such drafts and had collected them,
that that particular account had never been drawn down so
low as to be less than the total of the amount of the patrons'
money which was included therein; and hence results the
conclusion that in each of those accounts was the entire
amount of such patrons' money at the time when the bank
closed. It was of course shown that the balances of all such
accounts passed to the receiver and had either been collected
by him or still remain under his control. Upon this show-

ing, under the authorities already cited, there results inevitably the court's conclusion of law that the receiver had received in actual money or in credits with correspondents the $2,520.46 belonging to the patrons. If he received the same, of course he could hold it only as trustee for the owners. He did not receive it as moneys of the bank upon any trust to distribute to the creditors of the bank, for he could receive only the bank's property in that capacity and upon that trust. He is now, and has been at all times, chargeable with the duty of paying it, but to the true owners.

The conclusions of the trial court are attempted to be averted by most vigorous contention that it is wholly beyond the power of a national bank to engage in creamery business, and much citation is made of federal authority to that effect. The exact limits of the power of a bank which, being a creditor, becomes possessed of property or property rights in various forms as security to do acts in management or improvement of such property or development of such rights in order to render them valuable, to the end, in good faith, of thereby securing liquidation of the debts to it, is quite indefinite, and doubtless public policy requires that a bank, like an individual, should have broad powers of the exercise of discretion and judgment, to the end that property or rights so held as security be rendered as valuable as possible so that it may not lose that which it ought to collect. *Security Nat. Bank v. St. Croix P. Co.* 117 Wis. 211, 94 N. W. 74. But we need not try to resolve this somewhat uncertain and vexed question. No authority has been cited, and we think none can be, to deny the power of a banking corporation or any other corporation to disgorge property of another which it had got into its possession by any means whatever under a duty to disgorge. It may have had no legal power to take the steps by which the money of these plaintiffs' assignors came to its hands; but, having taken such steps and obtained their money, no such absurdity exists as a legal obsta-

cle to its surrendering it. It would be a reproach to the law to hold any such doctrine of inequity. *Beloit v. Heineman,* 128 Wis. 398, 401, 107 N. W. 334.

There are other grounds urged by the respondents, and indeed based upon the facts found by the court, upon which it is claimed that the judgment would be justified even were it not held that the bank was the real holder and custodian of the property turned over by the Jennes and of the right to collect the money of the patrons. Such grounds involve generally the doctrine of the chargeability of a depositary with responsibility to the true owner of funds if it receives them with notice of such rights. We need not discuss how effective such principle might be under other circumstances, having concluded that we must sustain the finding of the court to the effect that the bank was the actual party conducting this business and receiving these moneys. Upon that basis we are satisfied that the judgment of the court below was correct.

*By the Court.*—Judgment affirmed.