[File No. 6077.]

STATE OF NORTH DAKOTA for Itself and on Behalf of all Creditors of Defendant Bank, Plaintiff, v. FARMERS' STATE BANK OF MANDAN, NORTH DAKOTA, Defendant.

IN RE APPLICATION FOR PREFERENCE OF FARMERS' UNION LIVESTOCK MARKETING ASSOCIATION.

(244 N. W. 45.)

Opinion filed August 2, 1932.

*Lemke & Weaver,* for claimant.

*L. R. Baird,* in *pro per,* for defendant.

BURR, J.   On November 5, 1931, the Farmers' State Bank of Mandan closed its doors, and later was placed in charge of Mr. Baird as receiver.

That afternoon the Farmers' Union Live Stock Marketing Association deposited in the bank six checks aggregating $2,195.09—five drawn on banks in Fargo, North Dakota, and St. Paul, Minnesota, and one for $38.55 drawn on a bank in Mandan, presumably the First

National Bank. The record assumes these checks were good and were paid in the due course of business. There is neither evidence nor suggestion to the contrary. Thereafter it made demand upon the receiver that a portion of this deposit be allowed as a preferred claim.

The receiver petitioned the judge of the district court having jurisdiction of such matters to fix a time and place for a hearing on the demand, so that the receiver would be "advised as to the proper disposition thereof."

The district judge disallowed the application for preference, and the applicant asks for a review of said decision.

The deposit was made by means of a slip furnished by the Farmers' Bank, which slip had printed thereon the following provision:

"Any item, cashed, received for application on an obligation, or for collection or deposit and credit, will be accepted by this bank subject to the provisions of chapter 92, 1927 Session Laws of North Dakota. This bank may also charge back any item drawn on this bank not good at close of business on day deposited. . . ."

Almost immediately after the receipt of this deposit, the Farmers' Bank cleared with the First National Bank of Mandan, turning over to that bank these checks and other items, receiving from the First National Bank various items drawn upon itself and paying to the First National Bank the difference in cash or by draft.

The receiver stated "there was sufficient cash on hand at the time of closing to cover all these claims (the claims of the Farmers' Union and others) and I don't think there is any question on that point."

On this day the depositor owed the Farmers' Bank, but the amount of the checks deposited was $628.90 in excess of the indebtedness. These checks were not deposited for the purpose of paying this indebtedness, but in the general course of business subject to check. This appears to be recognized as the fact in the case. The depositor is willing to have its indebtedness to the bank deducted from the amount received from it at the time the bank closed, and therefore asks a preference of $628.90.

It is clear the Farmers' Bank got credit from the First National Bank for all of this deposit. There is no claim that the checks deposited could have been returned to the depositor.

Ordinarily the bank involved opened for business at 10 A. M. each

working day and remained open until 3 P. M. It was the regular practice of the Farmers' Bank to make daily clearances with the First National Bank of Mandan about 11 A. M. of each day. One of the assistant cashiers in the Farmers' Bank testified that the First National Bank was the only bank with which the Farmers' Bank cleared personally, all other clearances being by mail; that on the day of closing there "was a run" on the bank and the "directors were doing a lot of figuring and talking," "they were talking how long it would last and whether it would last and whether they would be able to cut in; " and that this "figuring and talking" continued all day. The Farmers' Bank had cleared with the First National Bank at Mandan that morning at 10 A. M. or 11 A. M. Some time between 2:30 P. M. and 2:45 P. M. of that day the First National Bank of Mandan brought "up some items" and the assistant cashier says "we paid them with items we had on them, plus the balance in cash or by draft," and further that "all of the items were cleared between them."

A depositor testified that just about closing time he made a deposit and that shortly afterwards the cashier told him that he "hated to see me come in there with that money," and "he would have it back in a week or so;" that "he was so nervous that time he didn't remember himself what people were in there depositing," "he was so nervous he couldn't remember himself what people were in there."

According to the record, this was the only day that two clearances were made with the First National Bank. Thus, within fifteen minutes after the receipt of these checks, deposited by the Farmers' Union, they had been transferred to the First National Bank of Mandan under the rules of clearance and in satisfaction of claims held by the First National Bank against the Farmers' Bank.

It is significant that while up to that time the invariable custom of the bank was to make its clearance with the First National Bank between 10 and 11 A. M. of each day, on this day there were two clearances made—the First National Bank brought over some more items for settlement about fifteen minutes before closing, and a few minutes after the Farmers' Union had made its deposit.

It is unnecessary for us to determine whether the bank was in fact insolvent, or known by the officers to be insolvent at the time the deposit was made.

When the bank, intending to suspend business entirely, receives from a customer a deposit without notifying the customer of its intention to suspend, an implied trust is created in the deposit, and the proceeds thereof, in favor of the depositor. It is the same as if it had received the checks for collection merely. It could not receive it for deposit to carry on banking business. The relationship was that of principal and agent rather than debtor and creditor. There is no difference in effect from receiving a deposit in such a case than in receiving it when it was known to be insolvent. There was a "run" on the bank and the officers may have determined to suspend business in order to prevent withdrawing creditors from getting an undue advantage, and in the expectation that though a "run" could not be averted yet all depositors would be paid in full. However, when the bank intended to cease as a banking institution, it should not receive deposits and a deposit so taken cannot be said to have been received in the ordinary course of business between the bank and customer so as to continue the relationship of creditor and debtor. The bank exists for the purpose of carrying on a banking business and the reception of a deposit is an assurance by the bank to the depositor that the amount of the deposit will be paid to the depositor upon demand in accordance with the terms of the deposit. The contract between a bank and the general depositor is "that the former will pay according to the checks of the latter and when drawn in proper form." Central Nat. Bank v. Connecticut Mut. L. Ins. Co. 104 U. S. 54, 26 L. ed. 693. The district court found the evidence did not justify the assertion that the bank was known to the officers to be insolvent. However, this is not controlling. The records show clearly the directors were concerned as to the condition of the bank. There was a "run" on the bank and it is apparent the officers were attempting to contrive ways and means to keep the bank in operation. The fact is the bank suspended and thus ceased to carry on the functions of a bank. It received and accepted this deposit at a time when it was determining to suspend business. The exact moment when the determination became complete is not shown. The fact remains it did not open for business the next day, and the remark attributed to the cashier shows that on or about the time this deposit was received that official knew what was the fate of the bank. It is true the burden of proof is upon the claimant to show that at the time

the deposit was received the officers had determined to close the bank; but such determination may be shown by the facts and the situation. The time the mutual determination became final is peculiarly within the minds of the officers and in the absence of proof from them as to the exact time we are warranted in believing that the officers had arrived at that conclusion at the time this deposit was received, hence it should not have been accepted by the bank, as the officials had determined to forego further banking operations.

Where a bank receives the proceeds of checks as agent for the depositor rather than in the regular course of business where the relation of debtor and creditor exists, these proceeds are a special deposit and are recoverable on the failure of the bank. Pacific Bldg. & L. Asso. v. Central Bank & T. Co. 127 Wash. 524, 221 Pac. 313.

The case of Northern Bank v. Zepp, 28 Ill. 180, was one where a bank signified its intention to withdraw its bills from circulation and close that part of its business and thus "cease to do any banking business whatever," and the court held that when it thereafter received from a customer a deposit, without notifying him of its intention to suspend, the customer could recover the full value of his deposit rather that the value in the bills of the bank which were at a discount, apparently of twenty-five per cent. The customer had deposited $384 in currency, and the bank offered to pay in full therefor $288.80 "in lawful gold coin of the United States, the same being a full and fair value of said amount of currency." The court held that to permit the bank to retain such deposit would be assisting in the perpetration of a fraud. The law prohibited a bank from doing any banking business whatever or exercising any banking powers except to "wind up its concerns" if it had signified its intention to withdraw its bills from circulation and the court held such enactment did not release it from liability for property acquired after filing this certificate of intent. To do so would be saying that the legislature had licensed the bank to commit a fraud upon the community; "by acquiring the means of the innocent, the unsuspecting and confiding portion of the community," and declared that while the law did not declare all banking transactions of such institution void, it declared that the banking powers should cease. The banking powers having ceased, the ordinary rela-

tionship of debtor and creditor which exists between a going concern and customer could not arise.

There is nothing in the record to show whether cash was received from other depositors by this bank after this deposit was made. There is no suggestion that any was received. While the evidence is vague in many respects, nevertheless many of the asserted facts seem to be conceded by the receiver himself. His attitude in this case was wholly commendable. The record shows he appeared before the district judge with the books and the records of the bank. He stated to the court, "I take it—these cases which are now before the court are claims for preference, and if I understand this correctly, the receiver is not directly interested one way or the other—the receiver is ready with books and records, if any of the claimants want to use them, and we are ready to present them as requested.—The question comes up as to whether or not necessary funds came into the hands of the receiver at the date of closing to pay the claims. That question will not be before the court at this time because there was enough money on hand the day of closing to pay them all, if and when allowed." He then stated he was prepared to stipulate with this claimant what the facts were. Nowhere did he claim or suggest that the cash on hand was received after these checks were received or that the checks were returned to the bank, or that they were not paid, or that they were not delivered to the First National Bank for settlement on the clearance. The issues seem to be whether the claims were entitled to a preference by having a trust in their favor impressed upon the cash on hand.

But the depositor must show that the assets of the bank were augmented by his deposits, and trace the funds into the funds out of which he expects to get his preference. Behm v. Baird, 59 N. D. 733, 231 N. W. 876.

It is not every deposit which augments the assets. A depositor may deposit in the bank a check on the same bank drawn by another depositor; but such deposit would not increase the assets of the bank. It is not enough, however, to show that the checks deposited were "used to pay the indebtedness to the bank in a clearance transaction with other banks." However, this case differs materially in fact from the case of Behm v. Baird, supra. Practically immediately upon receipt of the checks they were used by the bank to pay an indebtedness of the

bank. Instead of drawing $2,100 out of the cash on hand and paying the indebtedness of the bank and thus depleting the cash to this extent, these checks were used. It is conceded these specific items deposited with the bank were used to pay this indebtedness. There is nothing in the record to suggest that these checks were transferred otherwise than to the First National Bank and so they were delivered to pay a debt of the Farmers' Bank. This was done rather than take the cash out of the bank. The statements of the receiver show there was more than enough cash on hand to pay all the items represented by the second clearance without resorting to these checks, and it was a mere matter of convenience for the bank to transfer these checks instead. In this way the assets of the bank were augmented. Had the checks remained in the bank the depositor could have recovered them under the facts in this case. There is no difference in principle between this case and a case where the depositor brought $2,100 in cash, deposited it in the bank, and the bank took that cash and cleared items with it, leaving the amount of the deposit in cash on hand.

The claim for preference is not a suit to recover a specific thing. It is the identity of the fund that is sought to be established—the fund created from the checks—and the identical money need not be traced when the fund is increased by the deposit. 3 R. C. L. 554. Equity directs that a sufficient sum be taken from the mass to make restitution. Plano Mfg. Co. v. Auld, 14 S. D. 512, 86 N. W. 21, 23; Emigh v. Earling, 134 Wis. 566, 27 L.R.A.(N.S.) 243, 115 N. W. 128, affirmed in general in 218 U. S. 27, 54 L. ed. 915, 30 S. Ct. 672.

The depositor has traced the cash value of the checks into this fund. He may follow such property and reclaim it in any form into which it may have been changed, providing identification is possible. Merchants Bank v. Schatz, 59 N. D. 365, 230 N. W. 18.

When a deposit is made in such a manner as to create an implied trust in favor of the depositor and the trustee mingles the trust funds with his own and subsequently pays out a portion of the so-mingled funds, it is presumed that he made the payment from the portion of the fund which belonged to him and retained the portion which belonged to the other party but unless he can distinguish what is his own portion, the whole fund will be treated as the trust property. Widman v. Kellogg, 22 N. D. 396, 39 L.R.A.(N.S.) 563, 133 N. W. 1020.

The presumption is that the balance of the fund represents the deposit Woodhouse v. Crandall, 197 Ill. 104, 58 L.R.A. 385, 64 N. E. 292. The depositor is not asking a preference for the whole amount. It owed the bank money. It asks a preference for the remainder only. It deposited the funds in the bank, has shown fraud practiced on it, has shown assets augmented by this amount, and that the cash value which the checks represented was used to pay the debt, thus saving the cash on hand. The claimant is entitled to a preference for $628.90.

CHRISTIANSON, Ch. J., and NUESSLE, BIRDZELL and BURKE, JJ., concur.