Sellers *v.* Hayes.

---

## SELLERS, TRUSTEE IN BANKRUPTCY, *v.* HAYES ET AL.

[No. 20,285.　Filed October 27, 1904.]

BANKRUPTCY.—*Charging Vendee of Goods as Trustee ex Maleficio.*—Where, in an action by a trustee in bankruptcy against a vendee of a stock of goods and a bank furnishing the money for such purchase to such vendee, to charge them as trustees *ex maleficio* for the value of such stock, the fact that the vendee knew that the vendor, bankrupt, was insolvent is not enough, *per se*, to charge such vendee with a want of good faith.　*p. 425.*

SAME.—*Special Finding.—Conclusion.*—A special finding "that by the exercise of ordinary care it could have been discovered by defendants, at the time of said sale of the said R. L., it would hinder and delay his creditors on behalf of whom this suit is brought by preferring certain other creditors and paying their claims in full," is a mere conclusion, and adds nothing as a fact to such finding.　*p. 425.*

SAME.—Where, in an action by a trustee in bankruptcy to charge a vendee and a bank furnishing part of the purchase money, as trustees *ex maleficio* of a stock of goods bought from the bankrupt, the special finding fails to show (1) that defendant inquired as to what the bankrupt intended to do with the proceeds of the sale, or (2) defendants' opportunity of ascertaining bankrupt's purpose, or (3) whether the two items of indebtedness which were elements in the sale sought to be avoided were secured or unsecured, there is room for the inference that such sale was not fraudulent, since the debts assumed and paid might have been secured and thus have constituted a superior claim on such stock. *p. 425.*

SAME.—*Chattel Mortgage.*—Where, in an action by a trustee in bankruptcy to charge the vendee of a stock of goods and a bank advancing money for the purchase, as trustees *ex maleficio* for the value of such stock, the special finding shows that the mortgage permits the mortgagor, vendee, to make sales of the stock, the trustee in bankruptcy has no cause to complain, since the creditors of the vendee are not complaining, the trustee's remedy being to impeach the sale and not the mortgage. *p. 426.*

STATUTORY CONSTRUCTION.—Where the owner of a stock of goods sold the same in violation of §6637a *et seq.* Burns 1901 (Acts 1901, p. 505), the trustee in bankruptcy can not maintain an action to set aside such conveyance as being against the state law on behalf of the merchandise creditors for the reason that, if such statute be constitutional, it gives such merchandise creditors a lien on the goods, the purpose of the bankruptcy statute being to prevent inequality of payment among unsecured creditors.　*pp. 427–432.*

STATUTORY CONSTRUCTION.—If §6637a *et seq.* Burns 1901 (Acts 1901, p. 505), prohibiting sales of merchandise in bulk under certain conditions are to be construed as giving wholesale merchants a superior claim upon such stocks of goods so sold, then such act would be unconstitutional as violating the fourteenth amendment to the federal Constitution, prohibiting the state from denying to any citizen the equal protection of the laws, and from denying to any citizen the due process of the law. *pp. 432-438.*

From Tipton Circuit Court; *W. W. Mount,* Judge.

Action by Henry C. Sellers as trustee in bankruptcy of Rufus Laymon against the firm of Hayes & Hayes and the Farmers Bank of Frankfort. From a decree for defendants, the plaintiff appeals. *Affirmed.*

*J. C. Blacklidge, C. C. Shirley* and *Conrad Wolf,* for appellant.

*H. C. Sheridan,* for appellees.

GILLETT, J.—Appellant, as trustee in bankruptcy of Rufus Laymon, brought this action against the appellees, Hayes & Hayes and the Farmers Bank of Frankfort, Indiana, to recover the value of a stock of merchandise. The attempt was to charge appellees, as trustees, on the theory that Laymon had fraudulently conveyed the stock to them, and that they had converted it to their own use. Two of the paragraphs of complaint seek to avoid the conveyance on the ground that it was void under that subdivision of §67 of the bankruptcy law (30 Stat. at Large, 544) relative to conveyances made by the bankrupt within four months prior to the filing of the petition in bankruptcy with intent to hinder, delay, or defraud creditors. There were two further paragraphs of complaint, under which it was sought to avoid the conveyance under that subdivision of the section above mentioned authorizing the setting aside of conveyances which are void under the laws of the State, if made within four months of the filing of the bankruptcy petition. There was a general denial filed by each of the appellees. Pursuant to request, the court found the facts specially, and stated its conclusion of law thereon. The

conclusion was in favor of appellees. There was a judgment that appellant take nothing. It is assigned as error that the court erred in its conclusion of law.

The first question which is presented for our consideration is whether, in view of the issues tendered by the paragraphs of complaint first above mentioned and the facts found by the court, the conclusion should have been in appellant's favor.

Stated in their boldest outlines, the facts relative to the conveyance complained of are that within four months of the time that the petition in bankruptcy was filed, said Laymon sold a stock of groceries of the value of $3,500 to Hayes & Hayes, and that the consideration for said conveyance was the extinguishment of a debt of $200, due from Laymon to one of the purchasers, the assumption by Hayes & Hayes of a debt of $800, which Laymon was owing to a third person, and the payment to him of $2,500, which was advanced, as a part of the transaction, by the bank. The money so received by Laymon was afterwards used by him in the payment of certain of his creditors. Passing for the present the question whether the findings of the court show an intent and purpose on the part of the seller to hinder, delay, or defraud his creditors by said sale, the inquiry arises whether it appears from the findings that appellees were not in the position of purchasers in good faith and for a present fair consideration.

A number of facts are found as to the knowledge of appellees of the financial condition of Laymon at the time of the sale, and facts are found to have been within the knowledge of Hayes & Hayes which were sufficient to have put them on inquiry as to whether it was the purpose of Laymon to make preferences with the money received by him. Findings numbered forty-nine and fifty are as follows: "49. That at and prior to the time of said sale it was the purpose of said Laymon, and the defendants Hayes & Hayes knew that it was the purpose of said Laymon to pay some

of his creditors in full, and that he was not able to pay others
in full.  50.  That by the exercise of ordinary care it could
have been discovered by defendants, at the time of said sale
of the said Rufus Laymon, it would hinder and delay his
creditors on behalf of whom this suit is brought by prefer-
ring certain other creditors and paying their claims in full."

It seems scarcely necessary to say that the fact that a
seller is known by the buyer to be deeply indebted, or even
insolvent, is not enough, *per se,* to charge the purchaser
with a want of good faith.  It will be observed that find-
ing number forty-nine is not a finding that Hayes & Hayes
knew that it was the purpose of Laymon to pay some of
his creditors in full out of the money received by him from
said sale.  The statement in finding number fifty relative
to the exercise of ordinary care is a mere conclusion, and
it is further to be observed that that finding does not go
to the question as to what appellees might have discovered
as to the intent of Laymon, but only as to what would be
the effect of preferences in his financial circumstances.
Nothing can be added to a special finding by inference or
intendment.  *Craig* v. *Bennett,* 146 Ind. 574.  It is not
within the functions of an appellate tribunal to supply
any fact.  Whether appellees did or did not inquire of
Laymon as to what disposition he intended to make of the
proceeds of the sale does not appear, and there is no find-
ing as to their opportunity of ascertaining his purpose,
or that an inquiry of him would have revealed a purpose on
his part to pay certain creditors in full with said money.
In fact, there is room for the inference, notwithstanding
all of the facts found, that at the time the sale was made it
was not the intent and purpose of Laymon thereby to hin-
der, delay, or defraud his creditors, nor any of them.

Appellant's counsel insist, however, that the appellees
are not to be treated as purchasers in good faith and for a
present valuable consideration, because, it is asserted, there
were preferences provided for in the sale itself to the ex-

tent of $1,000. On the other hand, appellees' counsel contends that if an unlawful preference is given as a part of a contract for the conveyance of property, the transaction can not be reached on the ground that the conveyance is thereby rendered fraudulent, but that it is the business of the trustee, under §60 of the bankruptcy act, to bring suit to avoid the preference and to recover the money or property constituting the preference.

There is no finding as to whether the two items of indebtedness of Laymon, which were elements in the transfer sought to be avoided, were secured or unsecured. To constitute a preference, the effect of the transaction must be to enable the creditor preferred to obtain a greater percentage of his debt than any other creditor of the same class. §60a of the bankruptcy act; *Peterson* v. *Nash Bros.* (1901), 112 Fed. 311, 50 C. C. A. 260, 7 Am. B. R. 181; *Matter of Read* (1901), 7 Am. B. R. 111; 5 Cyc. Law and Proc., 369, and cases cited; Loveland, Bankruptcy, 576.

The last point made by counsel for appellant with reference to the sufficiency of the findings to authorize a conclusion of law in his favor under the first-mentioned paragraphs of complaint is that the chattel mortgage given by Hayes & Hayes to the bank was fraudulent, because it authorized the mortgagors to make sales of the property. This is not a case where creditors of Hayes & Hayes are complaining. So far as Laymon was concerned, the $2,500 of the purchase price, which was raised by mortgage, was paid to him in cash, and it does not lie in the mouth of the trustee of his creditors to impeach the mortgage, unless he can otherwise impeach the sale. Laymon received all that he bargained for, and, unless the trustee can avoid the principal transaction, we fail to perceive what concern he has with the validity of a mortgage which was executed on the property sold.

We now come to the question as to whether the sale can be impeached on the ground that it was void under the laws

of the State. It is provided in §67 of the bankruptcy act that "all conveyances, transfers, or incumbrances of his property made by a debtor at any time within four months prior to the filing of the petition against him, and while insolvent, which are held null and void as against the creditors of such debtor by the laws of the state, territory, or district in which such property is situate, shall be deemed null and void under this act against the creditors of such debtor if he be adjudged a bankrupt, and such property shall pass to the assignee and be by him reclaimed and recovered for the benefit of the creditors of the bankrupt."

It appears from the findings that in the making of the sale which is attacked in this action the parties thereto did not observe the various provisions of the act of March 11, 1901 (Acts 1901, p. 505, §6637a et seq. Burns 1901). The first section of that act—omitting the enacting clause —is as follows: "That a sale of any portion of a stock of merchandise otherwise than in the ordinary course of trade in the regular and usual prosecution of the seller's business, or a sale of an entire stock of merchandise in bulk, will be fraudulent and void as against the creditors of the seller, unless the seller and purchaser shall, at least five days before the sale, make a full detailed inventory showing the quantity and, so far as possible with the exercise of reasonable diligence, the cost price to the seller of each article to be included in the sale, and unless such purchaser shall at least five days before the sale, in good faith, make full, explicit inquiry of the seller as to the name and places of residence or places of business of each and all of the creditors of the seller and the amount owing each creditor; and unless the purchaser shall at least five days before the sale, in good faith notify or cause to be notified personally or by registered mail, each of the seller's creditors of whom the purchaser has knowledge, or can, with the exercise of reasonable diligence, acquire knowledge of said proposed sale and of the said cost price of the merchandise to be

sold and of the price proposed to be paid therefor by the purchaser. The seller shall at least five days before such sales, fully and truthfully answer in writing each and all of said inquiries: Provided, that the word creditors as used herein shall apply only to such creditors whose claims arose from the sale of some part of such stock of merchandise."

Appellees' counsel challenges the validity of the above act on the ground that it is an unwarranted restriction upon the right of contract, and he further contends that if the act is valid the creditors mentioned therein are alone authorized to bring the action. We may omit to decide the constitutional question stated, but a consideration of the second of said points appears unavoidable.

In taking up the latter question, we shall first consider the nature of the trustee's title. Section 70 of the bankruptcy act provides: "The trustee of the estate of a bankrupt, upon his appointment and qualification, and his successor or successors, if he shall have one or more, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt, as of the date he was adjudged a bankrupt, except in so far as it is to property which is exempt, to all  *  *  *; (4) property transferred by him in fraud of his creditors; (5) property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him." In 5 Cyc. Law and Proc., 341, it is said of the trustee: "He stands in the place of the bankrupt, with power to do what the bankrupt ought to have done, that is, pay the debts out of the assets. He becomes vested with the same kind of a title as though he were a purchaser, but such title is subject to all the rights and equities existing in favor of third persons against the bankrupt, except as to fraudulent conveyances and transfers, preferences, and other transactions in fraud of the bankruptcy act." While

it is true that under subdivision e, §70 of said act, it is
provided that "the trustee may avoid any transfer by the
bankrupt of his property which any creditor of such bank-
rupt might have avoided," yet we think that where the
right of a particular creditor is in the nature of that of a
mere lienor, the trustee can not represent him. Where, by
force of a statute, the effect of a conveyance is to create a
statutory lien in favor of a particular creditor, and the
conveyance is otherwise valid and sufficient to pass a title
to the purchaser, our opinion is that such a transfer can not
properly be denominated a fraudulent conveyance, or a con-
veyance which is "held null and void as against the credit-
ors of such debtor by the laws of the State." Notwithstand-
ing any provisions which are found in the bankruptcy act
relative to the right of the trustee to avoid particular
transactions of the debtor, yet the whole act must he read in
the light of the predominating purpose of congress with
reference to the distribution of the assets, namely, to pre-
vent any inequality of payment among the unsecured
creditors. *In re Hammond*, 3 Am. B. R. 466, 490, 98
Fed. 845. If a creditor has acquired a lien or security
which does not constitute a preference within the mean-
ing of the law, he need not come into the bankruptcy court
for the purpose of procuring an allowance of his claim
there. Should he, however, prove up as a secured creditor,
he can only participate pro rata in the general fund to the
extent of the overplus, and if he proves up as an unsecured
creditor, the general rule is that he must surrender his se-
curity. But in a case where he has only a lien on property
which has passed out of the bankrupt, by a conveyance
otherwise valid, so that the general estate would derive no
benefit from the surrender, it would seem that if he sought
to prove up as an unsecured creditor, the court might
properly require a marshaling of the assets. In any event,
we are unable to perceive how a creditor so situated can be
represented by the trustee in the enforcement of his claim,

or, indeed, how the creditor could be bound by such a litigation waged on his behalf. See *Eyster* v. *Gaff* (1876), 91 U. S. 521, 23 L. Ed. 403; *McHenry* v. *LaSociété, etc.* (1877), 95 U. S. 58, 24 L. Ed. 370; *Dudley* v. *Easton* (1881), 104 U. S. 99, 26 L. Ed. 668; Loveland, Bankruptcy, 606; *Runner* v. *Dwiggins* (1897), 147 Ind. 238, 36 L. R. A. 645. We assume, without deciding, that, if the claim of such a creditor is a lien or special right, it is a statutory right, and not one where a preference has been obtained by the timely institution of legal proceedings.

It remains to consider, at least to some extent, the legal effect of the act of 1901 relative to the sale of merchandise. The act is somewhat ambiguous. From a mere reading of its words, there is room for the interpretation that any creditor who has a claim against the original owner, on account of sales of goods at wholesale which have gone into the stock, is entitled, by means of such remedy as the law will imply as an adjunct to the statute, to subject the whole stock to liability to satisfy the indebtedness to him, no matter how small a remnant of the stock sold by him may remain.

Passing over without consideration possible intermediate shades of interpretation, it may also be said that the act is so framed that the conclusion might be reached that the purpose of it was to give to a creditor what would amount to a lien or particular right by statute, enforceable by legal proceedings, to recover against the goods involved in a particular sale the amount due him on account of that sale. In the latter view, notwithstanding the terminology of the statute with reference to the sale being fraudulent and void as against the creditor, it would be evident that in its essence the effect of the enactment would not necessarily be to enable any creditor to proceed with the collection of his entire debt, treating the sale as a nullity as against him, but the effect of the statute would be to create, *ex proprio vigore,* from the making of the sale

in defiance of the provisions of the act, a lien, or special statutory right, enforceable by appropriate legal proceedings to the extent suggested. Such a right would be analogous to a vendor's lien or to the lien of a material man. So it may also be stated that if the latter interpretation of the act were adopted, the sale as a whole would not necessarily be subject to impeachment by any one creditor. We are persuaded that a right so limited as this is not a right to impeach a sale which is "null and void against the *creditors* [our italics] of such debtor by the laws of the state." *In re Hammond, supra.* Under §67e of the bankruptcy act, which involves provisions relative to fraud, it is enough to avoid the sale if it be fraudulent as to any one creditor. In such a case there is an appropriateness, in order to provide for the general creditors, whom the trustee represents, that what were assets in the hands of the debtor and conveyed away in fraud should be returned to his general estate for distribution. Such a construction of the bankruptcy act as would enable a sale made without fraud in fact to be impeached for the benefit of the bankrupt's general estate because of an omission to comply with a statute which only permitted a particular creditor to assert what would amount to a particular lien for each sale ought not to be indulged in, since the transaction is without the letter and without the spirit of the bankruptcy act.

In discussing the question as to the legislative purpose in the enactment of the act of 1901, counsel for appellant state: "The evil aimed at by this legislation was that many retailers would buy goods and obtain credit from wholesale houses, and then sell out the stock without giving any notice to the wholesalers, and the wholesalers would then have no recourse upon the stock of goods or the business of the retailer. The purpose of the law was to remedy this evil, and to give the wholesalers recourse upon the stock of goods for their claims which had arisen because of their dealings with the retailer in his retail business.

The intention of the law was to include all wholesalers. If this be the purpose of the law (and we believe the history of the legislation fully bears us out in this statement) then it would have been in this case only necessary to find that the creditors, whose claims amounted to $556.56, as found by the court, were mercantile creditors, and that their claims arose from dealings with Rufus Laymon in his retail business at Frankfort, Indiana." If this construction of the act were permissible, there would be a greater degree of appropriateness in holding that the trustee might sue, since none of the creditors would have any specific right in the stock which could be called a security, and, if the trustee might not bring the action, in the case of a mercantile failure there would likely be a scramble among that class of creditors for advantage by means of legal proceedings, a condition which it was the purpose of the bankruptcy act to avoid. See *In re Hammond, supra.* In view of this we feel called upon to consider whether the statute would be constitutional if it were impressed with the interpretation contended for by counsel for appellant.

So to interpret the statute would mean that as to a certain class of property, which has been disposed of without complying with the provisions of the statute, the General Assembly has given to a certain class of creditors the monopoly of a remedy, which enables them to impeach the transaction irrespective of fraud, and that other creditors would be left remediless, so far as the statute is concerned. While there might be some reason in natural justice for giving a creditor a lien upon, or special right in, an article of personal property sold by him, for the unpaid purchase price, yet as there is no essential unity in a stock of goods, so that it can in all cases be said that the creditor's contribution to the stock is inseparable, and must therefore be held by him as a whole or lost to him as a whole, what justice is there in giving to mercantile creditors an extraor-

dinary right to follow the stock, because they have contributed to build it up, or because some portion of the goods sold by them remains on hand? It will be observed that the remedy which the statute purports to give is not made in anywise dependent upon the question as to whether there is in fact a confusion of goods. Whatever the remedy, it applies to all stocks. It may therefore be considered whether this statute, if it is to be construed as counsel for appellant contend, has been laid out on lines which represent admissible classification.

Why should a mercantile creditor be given a right as against that portion of a stock which is paid for which is denied to all others? If the indebtedness is in part for goods which have been sold and the proceeds have gone into the *corpus* of the debtor's estate, why has the favored debtor the right to secure his pay in full, when the banker, who also extended credit, the unpaid clerk, who aided in the transaction of the business, and the creditors generally of the merchant are denied a remedy under the statute? The upholding of such an enactment would be to invite the effort of the influential classes to obtain legislative privileges for themselves which would be common to all, if they are permitted to exist, and it would be to divide up the citizenship of the state in respect to rights so that equality before the law would be but a sounding phrase. There is an especial degree of appropriateness in enforcing the right of equality as respects statutes which relate to the administration of justice.

The business of legislating for the people of a state is a complex undertaking, and, where classification is permitted at all, due consideration should be given to the legislative determination that a particular classification is necessary; yet it is evident that if no limit can be put upon the authority to classify, where the power is not bound down by specific constitutional provision, it would be possible, under

that guise, to enact laws which would grossly offend against the fundamental right of equality.

The fourteenth amendment to the Constitution of the United States prohibits the state from denying to any person within its jurisdiction the equal protection of the laws. Both as respects this guaranty and that of due process of law it is settled that the state can not, through any of its agencies, exercise arbitrary and capricious power over persons or property. *Ex parte Virginia* (1880), 100 U. S. 339, 25 L. Ed. 676; *Yick Wo* v. *Hopkins* (1886), 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; *Dent* v. *West Virginia* (1889), 129 U. S. 114, 9 Sup. Ct. 231, 32 L. Ed. 623; *Duncan* v. *Missouri* (1894), 152 U. S. 377, 14 Sup. Ct. 570, 38 L. Ed. 485; *Gulf, etc., R. Co.* v. *Ellis* (1897), 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666; *Holden* v. *Hardy* (1898), 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780.

As was said in *Barbier* v. *Connolly* (1885), 113 U. S. 27, 31, 5 Sup. Ct. 357, 28 L. Ed. 923: "The fourteenth amendment, in declaring that no state 'shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of anyone except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same call-

ing and condition, and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses."

It was said in *Yick Wo* v. *Hopkins, supra,* that the guaranty of "the equal protection of the laws is a pledge of the protection of equal laws." The requirement is ordinarily satisfied with legislation that accords to every person or class of persons the same right which is enjoyed by other persons or other classes in the same place and in like circumstances. *Missouri* v. *Lewis* (1879), 101 U. S. 22, 31. It is apparent, however, that a statute which contains inequalities in fact can not be upheld, on the theory of classification, where the lines of division between persons or classes appear clearly to have no just relation to the subject-matter, since the amendment is a shield against the arbitrary exercise of the powers of government.

It was said by Mr. Justice Brewer, speaking for the court, in *Gulf, etc., R. Co.* v. *Ellis, supra:* "But arbitrary selection can never be justified by calling it classification. The equal protection demanded by the fourteenth amendment forbids this. No language is more worthy of frequent and thoughtful consideration than these words of Mr. Justice Matthews, speaking for this court, in *Yick Wo* v. *Hopkins* [1886], 118 U. S. 356, 369: 'When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power.' The first official action of this nation declared the foundation of government in these words: 'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty and the pursuit of happiness.' While such declaration of principles may not have

the force of organic law, or be made the basis of judicial decision as to the limits of right and duty, and while in all cases reference must be had to the organic law of the nation for such limits, yet the latter is but the body and the letter of which the former is the thought and the spirit, and it is always safe to read the letter of the Constitution in the spirit of the Declaration of Independence. No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government." The above language was quoted with approval by the court in *Cotting* v. *Kansas City, etc., Co.* (1901), 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92. The latter case forcibly points out the viciousness of legislation which, under the cloak of an exercise of the police power, attempts to lay burdens upon some and to exempt others, by means of a statute that is framed on lines which clearly evince the fact that the classification was purely arbitrary. In the course of that opinion the court quoted with distinct approval the following language of one of its former members, Mr. Justice Catron, in *Vanzant* v. *Waddel* (1829), 2 Yerg. 259, 270: "Every partial or private law, which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were this otherwise, odious individuals and corporate bodies would be governed by one rule, and the mass of the community who made the law, by another."

In *Connolly* v. *Union Sewer Pipe Co.* (1902), 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679, what is popularly termed an anti-trust act, denying to offending corporations the right to enforce their contracts by suit, was condemned because of a section by which it was sought to exempt persons and corporations in certain lines of business from the operation of the act. The court, after pointing out the fact that certain cases which it had decided, and which were

urged upon it as precedents for the upholding of the legislation before it, involved the validity of taxation acts, said: "Different considerations control where the state, by legislation, seeks to regulate the enjoyment of rights and the pursuit of callings connected with domestic trade. In prescribing regulations for the conduct of trade, it can not divide those engaged in trade into classes and make criminals of one class if they do certain forbidden things, while allowing another and favored class engaged in the same domestic trade to do the same things with impunity."

Judge Cooley says: "Every one has a right to demand that he be governed by general rules, and a special statute which, without his consent, singles his case out as one to be regulated by a different law from that which is applied in all similar cases, would not be legitimate legislation, but would be such an arbitrary mandate as is not within the province of free governments. Those who make the laws 'are to govern by promulgated, established laws, not to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and the countryman at plow.' This is a maxim in constitutional law, and by it we may test the authority and binding force of legislative enactments." Cooley, Const. Lim. (7th ed.), 559.

Our attention has been called to the rulings of this court upholding what is termed labor legislation. We do not regard such cases as in point. There are reasons for much of such legislation that makes the classification adopted admissible. *International Text-Book Co.* v. *Weissinger* (1903), 160 Ind. 349, 98 Am. St. 334; *Knoxville Iron Co.* v. *Harbison* (1901), 183 U. S. 13, 22 Sup. Ct. 1, 46 L. Ed. 55.

We are satisfied that to construe the act of 1901 as counsel for appellant insist that it should be construed, would lead to its overthrow. Whether it will bear the narrowest construction suggested above is not a question which we are called on to decide, but it is our view that if the

act is upheld it must be on the latter theory. This leads to the conclusion that the trustee can not avoid the conveyance by reason of the combined effect of the bankruptcy act and the act of 1901 concerning sales of merchandise.

Judgment affirmed.