WELLIVER, RECEIVER, *v.* COATE ET AL.

[No. 9,005. Filed January 11, 1917. Rehearing denied April 27, 1917. Transfer denied June 29, 1917.]

1. INSURANCE.—*Fire Insurance.—Organization of Company.— Right to do Business.—Statute.*—Section 4651 Burns 1914, Acts 1889 p. 346, providing that a fire insurance company is authorized to issue policies where it has applications for insurance in which there shall be taken not less than $100,000 in *bona fide* premium notes and $20,000 in cash by the company, contemplates that the latter sum shall be paid on applications for insurance and not advanced by the incorporators or any of them, under an arrangement whereby it was to be returned to them when the financial condition of the company permitted. p. 209.

2. STATUTES.—*Executive Construction.—Force and Effect.*—The opinion of the auditor of state interpreting a statute which he is charged to enforce, or the opinion of the Attorney-General in construing such statute, is not binding on the courts, but the fact that such opinions were obtained is entitled to weight in determining the *bona fides* of action based thereon. p. 210.

3. CORPORATIONS.—*Powers.—Right to Borrow Money.*—In the absence of a prohibitory provision in its charter or in its enabling and governing act, it is neither illegal nor *ultra vires* for a corporation to borrow money to carry out the purposes for which it was organized. p. 213.

4. INSURANCE. — *Fire Insurance Company. — Payment of Borrowed Money. — Recovery by Receiver. — Ultra Vires Acts.* — Where in a good-faith attempt to comply with §4651 Burns 1914, Acts 1889 p. 346, providing that a fire insurance company may issue policies when it has applications for insurance in

which there shall be taken not less than $100,000 in *bona fide* premium notes and $20,000 in cash, the statute contemplating that the latter sum be paid by applicants for insurance, the promoters and incorporators of an insurance company, misinterpreting the statute, advanced the $20,000, and the corporation received and used such sum for the legitimate purposes of the business, and later such incorporators, as directors of the company, in good faith and acting for the corporation paid back a portion of the money, the financial condition of the company being such at the time as to justify the belief that such payments could be made without impairing the corporation's liability to pay all losses that could reasonably be anticipated, the receiver of the company could not in its behalf recover the money so paid on the ground that the transaction was not within the powers of the corporation.    p. 214.

5.  CORPORATIONS. — *Debts.* — *Money Borrowed from Officers.*— *Liability.*—Where money is advanced to a corporation by its managing officers or directors, the transaction will be closely scrutinized to determine whether it was fair and just, and the conduct of the officers free from fraud, and such transactions, when not duly authorized, are usually regarded as voidable at the election of the corporation.    p. 216.

6.  INSURANCE.—*Insurance Company.*—*Debts.*—*Money Borrowed from Officers.* — *Payment.* — *Right of Receiver to Recover.* — Where the promoters and incorporators of a fire insurance company advanced it money, in an attempt to comply with certain statutory requirements relating to the organization of such concerns, on the condition that they were to be repaid when the financial condition of the company permitted, and the money was used for the legitimate purposes of the business, the receiver of the corporation, suing in its behalf, could not recover money later paid on the loan by such promoters acting as directors of the company on the ground that the persons receiving such payments were officers of the corporation, the transaction being fair, just and free from fraud.    p. 217.

7.  INSURANCE.—*Insurance Company.*—*Debts.*—*Money Borrowed from Officers.* — *Payment.* — *Action by Receiver to Recover.*— *Policy-Holders.*—*Estoppel.*—Where the promoters and incorporators of a fire insurance company advanced money to it in an attempt to comply with certain statutory requirements relating to the organization of such concerns, and later as directors of the company in good faith and in behalf of the corporation paid back a portion of the money in accordance with the agreement made when the loan was negotiated, the entire transaction being fair and free from fraud, the receiver of the company could not, in behalf of the policy-holders who were fully in-

formed before taking out their policies as to the arrangement whereby the money was advanced and the conditions as to its repayment, recover the money repaid, as such policy-holders were estopped by their knowledge of the facts. pp. 217, 218.

8. RECEIVERS.—*Corporations.*—*Fraud.*—*Powers of Receiver.*—A receiver, in his capacity as representative of the general creditors, may avoid transactions had by the corporation in fraud of their rights. p. 217.

9. RECEIVERS.—*Corporations.*—*Fraud upon General Creditors.*— Where claims are based on transactions had by a corporation, and which are binding on it, but are fraudulently prejudicial to the general creditors, the receiver as representative of the creditors holds adversely to the corporation. p. 217.

10. INSURANCE.—*Receiver.*—*Insurance Corporation.*—*Classes of Creditors.*—*Right of Action by Receiver.*—Where the majority of the policy-holders of an insolvent insurance company were estopped by their knowledge of the transaction to recover money paid to the directors of the corporation in repayment of certain money advanced by them in an attempt to comply with statutory requirements relating to the organization of mutual fire insurance companies, the receiver of the corporation could not recover such repayments in behalf of policy-holders who did not receive notice of the transaction, since a receiver, as trustee for the creditors, may prosecute only those causes of which all the general creditors are beneficiaries, and interests peculiar to a class of creditors, from the benefits of which the general creditors are excluded, are not represented by a general receiver for purposes of vindicating rights based thereon by litigation. p. 219.

From Marion Circuit Court (21,606); *Charles Remster*, Judge.

Action by Charles B. Welliver, receiver of the Indiana State Fire Insurance Company, against Alvin T. Coate and others. From a judgment for defendant, the plaintiff appeals. *Affirmed.*

*Miller & Dowling*, for appellant.

*William L. Taylor, Wilson S. Doan, James C. Matthews, Charles W. Smith, Henry H. Hornbrook* and *Albert P. Smith*, for appellees.

CALDWELL, J.—Appellant, as receiver of the Indiana State Fire Insurance Company, brought this action

against appellees, Alvin T. Coate, John H. Furnas, Russel T. Byers and Joseph L. Ebner, to recover $18,717.23, as money belonging to the insurance company, and alleged to have been wrongfully expended by appellees as officers and directors.˙ A trial by the court resulted in a judgment that appellant take nothing and that appellees recover costs. The substantial questions arise on exceptions reserved to conclusions of law stated on a special finding. The correctness of the finding is not challenged.

While the finding covers seventy-five pages of the record, its material part is substantially as follows: Prior to October 16, 1906, appellees with others were contemplating the organization of a Mutual Fire Insurance Company, under the act of 1852 and acts amendatory and supplemental thereto. §§4601, 4647 *et seq.* Burns 1908, §§3708, 3745 R. S. 1881. Appellee Byers, being an attorney, thereupon drafted proposed articles of association to be used in the organization of the company. Article 6 as proposed by Byers was as follows:

> "This corporation shall not issue policies of insurance or otherwise obligate itself upon any policy of insurance, until applications therefor approved by the board of directors shall have been made, in which there shall be taken not less than $100,000 in bona fide premium notes, and $20,000 in cash premiums."

Article 6 was based upon §4651 Burns 1914, Acts 1889 p. 346, which is in part as follows: "When application for insurance in which there shall be taken not less than a hundred thousand dollars, in *bona fide* premium notes and $20,000 in cash by any such company, and of which it shall be at the time possessed, and proof of the same is furnished to the auditor of state, the books containing the same verified by the secretary of the company, and examined and approved by him, as evi-

·denced by his certificate, such company may issue policies of insurance and renewals, on the same, for a term not exceeding seven years, against loss or damage by fire," etc.  Byers being inexperienced in the organization of insurance companies, submitted his draft of the articles of association to Coate, who was experienced in such matters, whereupon the latter stated respecting article 6 that it was difficult if not impossible to procure applicants for insurance to make cash payments on premiums prior to the organization of the company, and that the practice had been for certain of the promoters to advance the requisite cash, in order that a license might issue, the money so advanced to be the property of the company for all legitimate purposes, but to be refunded as the financial condition of the company safely permitted.  Byers thereupon submitted the articles as prepared by him to the deputy auditor of state, in charge of the insurance department, who in substance confirmed Coate's statements.  Byers, however, called the deputy auditor's attention to the language of §4651, *supra,* and stated to him that he was not clear whether the suggested plan was in harmony with its terms, whereupon the deputy auditor stated that he would take the opinion of the Attorney-General on the subject.  Subsequently at a meeting of the proposed organizers of the company, attended by and participated in by appellees, Byers presented his draft of articles and submitted the foregoing information, and suggested that if the opinion of the Attorney-General concurred with that of the deputy auditor, the proposed plan should be followed, otherwise that §6 should be complied with.  Thereafter, October 27, 1906, the Attorney-General gave to the auditor of state, in response to a request to that end, his opinion in writing, to the effect that the statute, *supra,* required that such a company be possessed of the $20,000 mentioned, not

as evidence of the *bona fides* of the enterprise or the good faith of those who had applied for insurance, "but only as evidence of the present financial responsibility of the organization"; that the statute did not require that such money be paid by those who had executed premium notes, but if possessed in good faith by the company, its source was not material, and that "in view of the fact that the main, if not the sole purpose of the requirement of $20,000 in cash, is to secure immediately available security for policy-holders, and considering that the proof of good faith on the part of the promoters and of the substantial character of the proposed business is adequately supplied by the possession of *bona fide* premium notes aggregating $100,000, I am of the opinion that the officers of a mutual fire insurance company, after securing the latter amount in premium notes, may themselves pay to the company $20,000 in cash, though none of it is received from those who execute premium notes." The proposed organizers of the company, including appellees, believing that the opinion of the Attorney-General was a fair interpretation of the statute, *supra*, appellees thereupon agreed that they would advance such sum of $20,000, and that it should be the property of said corporation when organized, and be used by it for all legitimate purposes of said corporation, to be repaid from time to time as in the opinion of the executive committee of said corporation, when the same should be organized, its financial condition would safely permit, and that such agreement should be made a part of the records of such corporation after its organization. Thereafter, May 13, 1907, appellees executed to the American National Bank of Indianapolis their sixty-day five per cent. note for $20,000, the proceeds of which in said sum were at the request of said Indiana State Fire Insurance Company, deposited to its credit and subject to its check. On the

same day, appellee Coate having been elected secretary of the company, as such filed in the office of the auditor of state his written affirmation that pursuant to notice duly given, the company had received applications for insurance on which it had taken *bona fide* premium notes aggregating $103,165.90 and that it had on deposit in said bank $20,000. The next day appellees Ebner, Byers and Coate, president, attorney and secretary of the company respectively, filed with the auditor of state their affidavit in support of such affirmation and to the effect, among other things, that they constituted a majority of the board of directors of the company, that they believed the facts stated in such affirmation to be true, and that on the delivery of the policies mentioned therein there would be paid on said premium notes the sum of $20,606. Annexed to the affidavit and verified by it was a schedule containing the names of 304 persons who had applied for insurance aggregating $885,000. On May 15, 1907, appellees presented to the auditor of state articles of association for the incorporation of the company, prepared under the act of June 17, 1852, and acts amendatory and supplemental thereto (§§4601 and 4647 *et seq.* Burns 1908), and duly signed and acknowledged. Thereupon the auditor of state with knowledge of the facts and of the arrangement under which said sum of $20,000 had been advanced by appellees and procured by the company, licensed the company to issue policies and certified its articles of association to the secretary of state. The company during its existence issued policies on the mutual plan, the members executing premium notes payable in installments as the board of directors might assess, and the liability of members being limited to the cash premiums and premium notes. Until August, 1909, it also issued policies on the stock plan. Each appellee was an incorporator of the com-

pany, and at all times a member of the board of directors, except Ebner who ceased to be a director January 11, 1910. The by-laws provided for the selection of an executive committee of three by the board of directors from their own number. Coate was a member of the executive committee after October, 1907, and secretary of the company at all times. Byers was at all times a member of the executive committee and attorney for the company until November 17, 1910. Ebner was president until January 11, 1910, and Furnas was treasurer until January 12, 1910. The sum of $20,000, procured and deposited as aforesaid, became the absolute property of the company on its organization, to be used by it for all legitimate purposes. Said sum, however, was to be repaid to appellees by the company in accordance with the agreement aforesaid, when in the opinion of the executive committee it could be safely done without impairing the financial condition of the company. At the time of executing said note and each renewal thereof for the balance after payments made, the makers thereof intended that the several notes should be, and the same were, their personal obligations, and the company was in nowise liable for the payment thereof. On October 5, 1907, at the first formal meeting of the board of directors, the members of which were appellees and one Fredericks, the board by unanimous vote adopted a resolution approving the action of appellees in negotiating said loan for the benefit of the company in accordance with the agreement aforesaid, and resolving that such sum should be repaid when in the opinion of the executive committee the funds of the company would justify. At a subsequent meeting of the board, of which Coate, Byers and Furnas constituted a majority, held May 19, 1910, the board by unanimous vote adopted, and ordered spread of record, a resolution to the effect that the said notes

executed by appellees represented their individual indebtedness and created no liability against the company, but that it was the original intent of the resolution of October 5, 1907, that as the funds of the company justified, the amount so placed to the credit of the company by appellees, with such interest as might accrue, should be returned to them. The court specifically finds that the facts embodied in the resolution of May 19, 1910, were true. Said sum of $20,000, deposited as aforesaid, was carried on the ledger of the company in an account designated as the "guarantee fund account." The board of directors, on the advice of the executive committee, made payments to the bank out of the assets of the company, which payments were credited by the bank on said note and its renewals as follows: December 26, 1907, $5,000; July 15, 1908, $5,000; September 15, 1908, $5,000; May 19, 1909, $2,500. Also interest amounting to $1,217.73. On such payments being made, a credit was entered on the books of the company to the effect that that amount of the guarantee fund had been returned. When the company made each of the payments, appellees executed to the bank a substituted renewal note for the unpaid balance. The last renewal, however, given May 19, 1909, for $2,500, was executed only by Coate, Furnas and Byers. When each of such payments, principal and interest, was made, Coate, Ebner and Byers constituted the executive committee and also a majority of the board of directors. The executive committee and the board of directors and appellees in good faith believed at the time that such payments could be safely made without impairing the ability of the insurance company to pay all losses that might reasonably be anticipated. Appellees at all times intended that said note and the renewals thereof should be and the same were the personal obligations of appellees, and not the

liabilities of the company. Certain specific financial reports to the company, the policy-holders, and the board of directors were made by appellees and at their instance as officers and directors. The earliest of these reports was made January 28, 1908, and the last one January 11, 1910. The respective reports are set out either specifically or substantially in the finding. The sum of $20,000, advanced by appellees, appears in each of these reports in the sense that it augments the assets. Its source, however, is not revealed. The reports disclose the payments made on said note and its renewals being designated in each case as made "for refund of guaranty deposit." The report dated January 11, 1910, was made to the company by Coate as secretary, and approved by the other appellees as directors. A printed copy was mailed on or about said day to each member and policy-holder. This report contained an explanation of the origin of the fund of $20,000, and a statement to the effect that the company was entitled to return such fund in such installments and at such times as its finances would reasonably permit, and that the company had returned $17,500 of such fund. The company made and filed with the auditor of state three reports disclosing its assets and liabilities and its income and expenditures for the respective periods covered, dated respectively January 29, 1908, February 23, 1909, and April 7, 1910. The first two were verified by Coate and Ebner, the last by Coate and Furnas. The court finds each of such reports to have been a correct statement of the assets, liabilities, income and expenditures of the company for the period covered by it. These reports are included in full in the finding. They cover twenty-two pages of the transcript. In each of them also the fund of $20,000 augments the assets, there being, however, no explanation of its origin. These reports set out the amounts

of the respective payments made on said note and its renewals, designated in the respective reports as follows: Return of the organization fund, $5,000; payment guarantee fund, $10,000; payment return guaranty fund $2,500. Neither in the reports made to the auditor of state, nor in those made to the company and policy-holders, is the obligation to repay listed as a liability, except as set out in the report of January 11, 1910, as aforesaid. Before making and filing the first of the reports to the auditor of state above mentioned, Coate, as secretary of the company, consulted the deputy auditor of state in charge of the insurance department, as to whether under the facts surrounding the transaction as herein set out, the receipt and retention of said sum of $20,000, designated on the books of the company as a guarantee fund, should be shown in the report as a liability of the company. The deputy auditor advised Coate that such obligation, under the circumstances, should not be listed as a liability. As above set out, 304 persons applied for insurance in the prospective company, and with their applications executed premium notes aggregating $103,165.90, before license was issued by the auditor of state. Such applications and notes were procured by agents and canvassers employed for that purpose. The organizers of the company, including appellees, directed such agents and canvassers, in soliciting such applications and in taking premium notes, to explain fully to the persons solicited the facts respecting the advancing of the $20,000, and the time when and the circumstances under which it was to be repaid. These instructions as a general rule were followed, and the facts respecting the advancing of said sum and the arrangement for its repayment were generally made known and explained to such applicants. In some particular instances, however, the instructions were not followed. Also, after

license was issued, canvassers in soliciting insurance in behalf of the company continued in a general way, except in some particular instances, to inform persons solicited both respecting the plan pursued in procuring said $20,000, and the arrangement for its repayment as above set out. At no time prior to the appointment of the receiver, as hereinafter set out, had any policyholder objected to the conduct of appellees or the board of directors, in advancing or procuring said sum, in executing the notes and the renewals therefor, or in repaying such sum in part as above set out. Appellees, at all times prior to the appointment of the receiver, believed that their acts and conduct with reference to such transaction were consented to and approved by the members and policy-holders. Appellees at no time attempted to conceal the fact that said sum of $20,000 was to be repaid as the financial condition of the company would permit, or that payments had been or were being made thereon. The company paid dividends to its policy-holders, from time to time, aggregating $8,866.16, no part of which has been returned.

Appellees in advancing the $20,000 did not contract for, nor expect to receive, and they have not received, any profit therefor other than as enjoyed proportionately by every other member of the company. All said sum was expended by the company for the benefit of all the members and policy-holders. The remaining sum of $2,500 which has not been returned to appellees (by being paid to the bank or otherwise), has been paid to the bank by Coate, Furnas and Byers, who executed the renewal note therefor as above set out. Such sum has not been repaid to them, and on January 17, 1911, they filed with the receiver a waiver of any right to such repayment. The court includes in the finding certain statements of the assets and liabilities of the com-

pany on December 31, 1907, July 31, 1908, September 30, 1908, and May 31, 1909, respectively, being at the close of the respective months in which the payments aggregating $17,500 for application on the note and its renewals held by the bank and executed by appellees were made. These statements indicate that at each of such times the company was apparently in sound financial condition. The court finds that the financial condition of the company immediately after making such payments was substantially the same as on the dates of such statements respectively. Early in 1910 serious dissension arose among the officers and directors. Each party sent communications to the policy-holders in advocacy of the merits of the controversy from its standpoint. As a result a large and unusual number of the members surrendered their policies, which were canceled, and the unearned premiums thereon returned in cash, aggregating about $16,000, in a period of ninety days after April 1, 1910. Mutual policies were issued for periods of from one to five years. On November 17, 1910, the company was adjudged insolvent and appellant appointed receiver. At that time there were unpaid fire loss claims aggregating $17,525.21. There were also miscellaneous liabilities other than claims based on premiums paid, but unearned, aggregating $889.95. The total assets of the company, exclusive of the contingent liability of its members on premium notes given, amounted to $6,-736.84. In order that the fire losses and expenses of the receivership might be paid, the receiver, by order of court, levied and collected from all the assessable members an annual premium on the premium notes held by the company. From such source the receiver realized $14,589.02, collected from 440 members. Five hundred of the policy-holders had previously prepaid their premiums for a year beyond November 17, 1910,

aggregating $11,723.22. In levying such assessments, the receiver took account of such prepaid premiums and adjusted them by making proper credits on the involved assessments, leaving, however, a balance of prepaid premiums not restored to certain policy-holders. Drawing on the fund arising from the assets that came into his hands and the sum realized from such assessment, the receiver has paid all the liabilities of the company, except the cost of the receivership, the costs and expenses incident to the prosecution of this suit, and claims based on such unearned premiums not restored. He has in his hands an unexpended balance of $4,916. The receiver has not repaid to the assessed members any part of the sums collected from them respectively through such assessment, and the balance remaining in his hands is not sufficient to that end. No part of the sum aggregating $18,717.73, including interest, paid by the company on said note, and the renewals thereof, executed by appellees to the bank, has been repaid to the company or to the receiver.

On the facts so found, the court stated five conclusions of law to the effect that the law is with the appellees, and that appellant is not entitled to recover; that certain members and policy-holders are estopped from maintaining the action, and that certain members are so estopped by reason of their knowledge and acquiescence in the facts attending the advancing and use of said sum of $20,000, and its repayment in part, and that as a consequence, the receiver is not entitled to maintain the action for their benefit, and not being entitled to recover for all the members and policy-holders, he cannot recover for the benefit of any of them; that appellees are entitled to recover costs. If the conclusions to the effect that by reason of the principle of estoppel operating against certain members and policy-holders the receiver is not entitled to maintain

this action are correctly stated on the finding, it follows that the general conclusions that the law is with appellees and that they are entitled to recover costs are correctly stated also. We proceed to consider the conclusions.

The promoters of the Indiana State Fire Insurance Company in considering its organization were confronted by a statute providing in substance that such a company might be authorized to issue policies of insurance against loss by fire, etc., "when applications for insurance in which there shall be taken not less than a hundred thousand dollars, in *bona fide* premium notes and $20,000 in cash by any such company, and of which it shall be at the time possessed." §4651 Burns 1908, 1914, *supra.*

Appellant contends, and appellees apparently concede, that such statute contemplated that the $20,000 mentioned should be paid on applications for insurance. In our judgment appellant correctly interprets the statute in this respect. The promoters and incorporators of the Indiana State Fire Insurance Company, among whom were included appellees, did not so proceed. Being uncertain as to the meaning of the statute in the respect under consideration and as to whether the advancing of the sum by the incorporators or a number of them would satisfy its terms, they applied to the state official charged with the duty of supervising insurance companies and their organization for information. By him they were advised in substance that the statute did not require that the sum mentioned should be paid on applications for insurance; that the essential element was the good-faith acquisition and possession of the sum, and its availability for the legitimate purposes of the company; that the statute would be satisfied if the incorporators or

any of them advanced the money under an arrangement by which it should be returned to them when the financial condition of the company would permit, keeping in view its obligation to its policy-holders; that the statute had received a practical interpretation to that effect in the organization and licensing of other companies. Application having been made to the Attorney-General of the state, he in a written opinion substantially concurred in the opinion of the auditor of state. Of course, the opinion of the auditor of state interpreting a statute with the enforcement of which he is charged, or the opinion of the Attorney-General in construing such a statute, is not binding on the courts, but the fact of such opinions is entitled to weight in determining the *bona fides* of action based thereon. Appellees thereupon in the utmost good faith executed their note by which they procured $20,000 and obligated themselves to pay the note when due. They delivered the sum to the company. The company accepted it with full knowledge of its source, and under an arrangement by which it was to be repaid when the finances of the company would safely permit. The company received the full benefit of the money, placing it in a fund subsequently drawn on to pay fire losses, expenses, dividends to its members, etc. Appellees in advancing the money were actuated by no improper or selfish motive; they neither contracted for nor expected to receive any advantage or benefit peculiar to themselves; they did not receive any such advantage or benefit. Risking the loss of the sum advanced, as subsequently they did lose a substantial part of it, they were actuated solely by a purpose and desire to advance the interests of the company. They made no effort to conceal the fact that they had advanced the money, and that conditionally it was to be repaid to them. but on the contrary took steps by which every

2.

applicant for insurance and every member of the company on becoming such should be fully informed of the facts, and as a general rule such applicants and members were so informed.

From time to time the company in harmony with the original understanding discharged its conditional obligation in part by paying money to the bank for application on the note and its renewals, until $17,500 of the principal and $1,217.73 of the interest, or a total of $18,717.73 had been paid. Facts are found to the effect that when each of the payments was made, the financial condition of the company was apparently such as to justify an honest belief that it could be safely done. This action is predicated on the fact of such payments. The receiver sues to recover back the amount paid, with interest.

It appears from the finding that the policy-holders and members of the insurance corporation are financially interested in this litigation, if at all, in their capacity as creditors based on the fact of the assessments paid and advanced by them. From the conclusions of law, it is apparent that the decision in favor of appellees was based on estoppel operating against certain policy-holders and members who claim to be creditors, by reason of assessments paid and advanced. It is appellant's contention, however, that the cause of action on which the receiver sued was that of the corporation, rather than that of the individual policy-holders, and hence that estoppel operating against certain of the latter did not defeat the action. Respecting the title of a receiver, and the basis of his right to bring and maintain actions, we quote the following from *Marion Trust Co.* v. *Blish* (1908), 170 Ind. 686, 691, 84 N. E. 814, 85 N. E. 344, 18 L. R. A. (N. S.) 347: "There can be no doubt of the proposition that it is the general rule that in the ordinary receivership which is extended

over the affairs of an insolvent corporation, the receiver can only sue in the right of the corporation, and that he is subject to all of the equities which would have been available against it.   This rule is subject to the exception that the receiver so far represents the general creditors that he may avoid transactions in fraud of their rights.   'Since the appointment of a receiver *in limine* does not affect any questions of right involved in the action, and does not change any contract relations or rights of action existing between parties, it follows as a general rule that in ordinary actions brought by a receiver in his official capacity, to recover upon an obligation or demand due to the person or estate which has passed under the receiver's control, the defendant may avail himself of any matter of defense which he might have urged had the action been brought by the original party instead of by his receiver.' High, Receivers (3d ed.), §245.   In a subsequent section of the same work the author says:   "While the receiver of an insolvent corporation is thus treated as the representative of both creditors and shareholders, so far as any beneficial interest is concerned, yet, for the purpose of determining the nature and extent of his title, he is regarded as representing only the corporate body itself, and not its creditors or shareholders, being vested by law with the estate of the corporation, and deriving his own title under and through it.   For purposes of litigation, therefore, he takes only the rights of the corporation, such as could be asserted in its own name, and upon that basis only can he litigate for the benefit of either shareholders or creditors, except when acts have been done in fraud of the rights of the latter, but which are valid as against the corporation itself, in which case he holds adversely to the corporation.' High, Receivers (3d ed.), §315."

Considering the cause of action as the corporation's,

and that appellant acquired from it his right to bring and maintain the action, we are confronted with the following situation: Appellees, actuated solely by a purpose to further the interests of the company, and with no hope or expectation of benefit to themselves, except such as they would enjoy in common with all the members, in perfect good faith advanced the money involved. The corporation at the time of receiving it, and in consideration of its advancement, through its board of directors, acting by unanimous vote, agreed to repay it when and as the financial condition of the company permitted. The corporation used the money for its own purposes, and kept its agreement to the extent of repaying $17,500 and interest. From the beginning of the transaction to the end, appellees were not guilty of fraud, bad faith or neglect. This action is brought to recover the sum paid. The mere statement of the facts is apparently convincing that had no receiver been appointed, the corporation could not have maintained the action and consequently that the receiver, if suing in its right, cannot maintain it. There are other arguments and facts, however, that must be considered.

Thus it is urged that the entire transaction by which the corporation received money and in part returned it was illegal and *ultra vires*. The transaction by which the money was advanced to the company considered by itself was in effect a loan. It was a loan of money to the company to be used by it for legitimate purposes. It was so used. It was expended in the payment of fire losses, expenses and dividends declared in favor of members. In the absence of a prohibitory provision in its charter or in its enabling and governing act, it is neither illegal nor *ultra vires* for a corporation to borrow money to carry out the purposes for which it was organized. *Wright* v. *Hughes* (1889), 119 Ind. 324, 21 N. E. 907, 12 Am. St. 412.

Under the facts here, however, the advancing of money cannot be considered as an independent transaction. It cannot be disassociated from the statutory requirement respecting the acquisition and possession of $20,000 in cash as a condition to the right to issue policies. The statute then in force (§4651 Burns 1908) contemplated that that sum be advanced on applications for insurance, and that it be held and used for the proper purposes of the company. The advancing of a like sum by appellees was intended as a compliance with the statutory requirement. It was based on a misinterpretation of the statute. Appellees, however, as found by the court, proceeded in good faith. If, under such circumstances, the receipt of the money by the corporation with the conditional agreement to repay it and its subsequent repayment in part should be deemed to be *ultra vires,* for the reason that such a method of acquiring money or an agreement to repay it, or its actual repayment, however acquired, was not within the purview of the statute, then the case presents itself as follows: The action is not brought to annul the arrangement made between appellees and the corporation, or to enjoin the taking of steps to carry it out. The contract has been executed on each side. No one interested raised any voice of protest prior to or at the time it was carried out, or when any steps were taken to perform it. Appellees advanced the money. The corporation received and used it for legitimate purposes. It made exactly the same use of the sum advanced by appellees that it would have made of a like sum paid on applications for insurance as contemplated by the statute. In the actual case the corporation created a liability to repay conditioned on its reasonable financial ability to do so. Had the statute been followed, the company, by receiving the money on insurance applications, the policies thereafter being is-

sued, would have created a liability conditioned on fire losses occurring. To the extent that the sum advanced by appellees is involved in this action the company repaid it. "The rule is now too thoroughly established to be longer open to question, that where a contract has been executed and fully performed on the part of the corporation, or of the party with whom it contracted, neither will be permitted to insist that the contract was not within the power of the corporation." *Wright* v. *Hughes, supra,* and cases. "Where a corporation receives the money or property of another under an agreement or duty to account therefor it may be compelled to perform such duty though the transaction was ultra vires." 7 R. C. L. 677. Certain language used in *Rankin* v. *Emigh* (1910), 218 U. S. 27, 33, 30 Sup. Ct. 672, 54 L. Ed. 915, is worthy of consideration here, viz.: "No authority has been cited, and we think none can be, to deny the power of a banking corporation, or any other corporation, to disgorge property of another which it had got into its possession by any means whatever under a duty to disgorge. It may have had no legal power to take the steps by which the money of these plaintiffs' assignors came to its hands; but having taken such steps and obtained their money no such absurdity exists as a legal obstacle to its surrendering it. It would be a reproach to the law to hold any such doctrine of inequity. *Beloit* v. *Heineman,* 128 Wisconsin, 398, 401, (107 N. W. 334)." On the subject of the relation of the doctrine of *ultra vires* to executed contracts, see, also, the following: *State Board, etc.* v. *Citizens' St. R. Co.* (1874), 47 Ind. 407, 17 Am. Rep. 702; *Louisville, etc., R. Co.* v. *Flanagan* (1888), 113 Ind. 488, 14 N. E. 370, 3 Am. St. 674; *Emigh* v. *Earling* (1908), 134 Wis. 565, 115 N. W. 128, 27 L. R. A. (N. S.) 243; *Manchester, etc., Railroad* v. *Concord Railroad* (1889), 66 N. H. 100, 20

Atl. 383, 9 L. R. A. 689, 49 Am. St. 582; *Central Transportation Co.* v. *Pullman's, etc., Car Co.*, 35 L. Ed. 55, note; *In re Assignment Mutual, etc., Ins. Co.* 70 Am. St., note 167.

We do not overlook the fact that when the transactions involved here were had appellees were members of the board of directors of the insurance company. It is universally held that transactions between a corporation and its managing officers or directors, wherein money is advanced to the former by the latter, will be carefully examined by the courts to determine whether such transactions were fair and just, and whether there has been any fraud or overreaching on the part of such officers or directors. Such transactions when not duly authorized are usually regarded as voidable at the election of the corporation. *Bossert* v. *Geis* (1914), 57 Ind. App. 384, 107 N. E. 95, and cases; *Green* v. *Felton* (1908), 42 Ind. App. 675, 84 N. E. 166. But when such a transaction is not prohibited by law, "The broad doctrine that the officers of a corporation cannot in their own names contract with it is unreasonable. Such a holding would virtually deny to corporations the credit upon which their business may be transacted. If the right of the stockholders and officers of a corporation to advance money to it to carry on its affairs, or to endorse for it and obtain money for such purpose, is denied, it would result in depriving the corporation of its most ready and frequent source of credit. If directors can lend money to the corporation, or endorse for it, under the laws in this state, they should certainly have the right to collect their debt or be secured therein as is accorded by law to other creditors." *Levering* v. *Bimel* (1896), 146 Ind. 545, 554, 45 N. E. 775. See, also, *Bristol, etc., Mfg. Co.* v. *Probasco* (1878), 64 Ind. 406; *Twin-Lick Oil Co.* v. *Marbury* (1875), 91 U. S.

587, 23 L. Ed. 328; 2 Thompson, Corporations (2d ed.) §1247.

The transaction here has been submitted to the careful scrutiny of the trial court. The finding makes a very strong case that appellees' conduct was characterized by openness and entire good faith. They sought no advantage. They anticipated no gain to themselves. Having an eye single to the company's good, as they understood it, they ran the hazard of loss subsequently suffered. We do not believe that the receiver by virtue of his title acquired from the corporation can maintain this action.

We have yet to consider the case in its relation to the members and policy-holders of the corporation who by reason of advance payments on their policies and by the payment of assessments on the call of the receiver may be deemed to be creditors of the company. In fact there are no unpaid creditors except such members and policy-holders. "When a court has taken possession of the property of an insolvent corporation for administration, and appointed a receiver, the property of the corporation is a trust fund for the payment of its debts. * * * Such receiver represents the creditors as well as the stockholders and holds the property for the benefit of both. He is the trustee for both, and, as trustee for the creditors, can maintain and defend actions which the corporation could not." *Franklin Nat. Bank* v. *Whitehead* (1897), 149 Ind. 560, 583, 49 N. E. 592, 39 L. R. A. 725, 63 Am. St. 302.

The receiver in his capacity as representative of the general creditors may avoid transactions had by the corporation in fraud of their rights. *Marion Trust Co.* v. *Blish, supra.* As to claims based on transactions had by a corporation, and which are binding on it but which are fraudulently prejudicial to the general creditors, the receiver

as a representative of the latter holds adversely to the former.   High, Receivers (3d ed.) §315.

The second, third, and fourth conclusions of law deal with the case in its relation to members and policy-holders as creditors with claims originating as aforesaid.   If, under the facts found, this action may be maintained by the receiver as the representative of such creditors, it is on the theory that they as members and policy-holders dealt with the company and became members and policy-holders in reliance on the belief that the sum of $20,000 involved had been paid on applications for insurance as required by the statute, rather than that it had been advanced by appellees as aforesaid.   The finding, however, renders the existence of any such belief impossible as to the greater number of the members and policy-holders.   The finding is to the effect that as a general rule the members and policy-holders at the time they applied for insurance, and when the policies were issued, were fully and specifically informed respecting the advancing of such sum by appellees, and the arrangement by which it was to be repaid.   With such knowledge they became members and policy-holders.   Under the finding there were exceptions, but the class that acted with full knowledge was by far more numerous than the class that did not have such knowledge.   The sum advanced by appellees became a part of a fund drawn on for the payment of dividends aggregating more than $8,000.   The members of each class alike received and retained dividends apportioned to them.   It is apparent that as to the members of the class that had full knowledge of the facts, the foundation of the cause of action prosecuted in their behalf as beneficiaries has crumbled.   By their acquiescence they are estopped.   As having a bearing, see the following:   *Bent* v. *Underdown* (1900), 156 Ind. 516, 60 N. E. 307; *Bruner* v. *Brown* (1894), 139

Ind. 600, 38 N. E. 318; *Reel* v. *Brammer* (1913), 56 Ind. App. 180, 101 N. E. 1043; *Lea* v. *Iron Belt, etc., Co.* (1906), 147 Ala. 421, 42 South. 415, 8 L. R. A. (N. S.) 279, 119 Am. St. 93; *First Nat. Bank* v. *Gustin, etc., Mining Co.* (1890), 42 Minn. 327, 44 N. W. 198, 6 L. R. A. 676, 18 Am. St. 510; *Hospes* v. *Northwestern, etc., Car Co.* (1892), 48 Minn. 174, 50 N. W. 1117, 15 L. R. A. 470, 31 Am. St. 637; *Hill* v. *Railroad* (1906), 143 N. C. 539, 55 S. E. 854, 9 L. R. A. (N. S.) 606, and note.

A cause of action exists then, if at all, in favor of a class of creditors, rather than in favor of all the general creditors. A receiver, as trustee for creditors, may prosecute only those causes of which all the general creditors are beneficiaries. Interests peculiar to a class of creditors, and from the benefits of which the general creditors are excluded, are not represented by a general receiver for purposes of vindicating rights based thereon by litigation. Otherwise would be to permit him to act in antagonism to the beneficiaries of the trust which he represents. It results that on the assumption that the receiver sues as trustee for the creditors, he cannot, under the finding, maintain this action. It follows that there is no error in the conclusions of law. *Marion Trust Co.* v. *Blish, supra; Sellers* v. *Hayes* (1904), 163 Ind. 422, 429, 72 N. E. 119; *Ellison* v. *Ganiard* (1906), 167 Ind. 471, 79 N. E. 450; *Reel* v. *Brammer, supra.*

Other questions presented are disposed of by our discussion of the conclusions of law. Judgment affirmed.

NOTE.—Reported in 114 N. E. 775. See under (2) 36 Cyc 1140; (3) 10 Cyc 1101; (4-7) 22 Cyc 1414, 1415.